543 A.2d 514

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**William MOSS, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 12, 1987.

Decided May 20, 1988.

338

John W. Packel, Leonard Sosnov, Philadelphia, for appellant.

Ronald Eisenberg, Chief, Appeals Div., Gaele McLaughlin Barthold, Deputy Dist. Atty., Ann C. Lebowitz, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION

ZAPPALA, Justice.

William Moss appeals by allowance a Superior Court order 351 Pa.Super. 637, 504 A.2d 363, affirming judgment of sentence imposed by Philadelphia County Court of Common Pleas on convictions of robbery (two counts), burglary, criminal conspiracy, possession of instrument of crime, and terroristic threats. At issue are the propriety of the decision to certify Moss for trial as an adult, the validity of the probable cause determination on which the arrest warrant was issued, and the admissibility of an inculpatory statement Moss gave to police.

The incident underlying the convictions in this case was the May 14, 1981, gunpoint robbery of Gistino and Theresa Pigna at their northeast Philadelphia home by two young men. This incident was one of a number of neighborhood burglaries fitting a pattern under investigation by police.

Acting on information received from a local youth, the police arrested Moss and Matt Pettit in connection with another of these burglaries. Upon questioning, Moss denied involvement in the incident cited in the arrest warrant, attributing it solely to Pettit, but acknowledged having committed a number of other burglaries in the area, one of them being the Pigna residence.

## A.

■ Moss's claim that he was improperly certified for transfer from juvenile to adult court may be readily rejected. There can be no dispute that the juvenile court applied the correct rules of law to decide the certification question. The Commonwealth had the burden of proving that Moss was not amenable to treatment, supervision, or rehabilitation as a juvenile through available facilities; that he was not committable to an institution for the mentally retarded or mentally ill; and that the community interest required restraint or discipline, or that the offenses, if committed by an adult, would carry a sentence of more than three years. 42 Pa.C.S. § 6355(a)(4); *Commonwealth v. Greiner*, 479 Pa. 364, 388 A.2d 698 (1978).

Moss's challenge goes only to the finding that he was not amenable to treatment, supervision, or rehabilitation through available juvenile facilities. He asserts that the court's finding was made solely on the nature of the crime charged, contrary to our holding in *Greiner*. He further calls attention to letters of acceptance from two juvenile facilities as evidence of his amenability to treatment through available facilities.

■ Superior Court has consistently stated the appropriate limited scope of review of certification decisions. "Absent a failure by the certification court to advance specific reasons for its conclusion ... we will not set aside a certification unless an appellant demonstrates that the court committed a *gross abuse of discretion.*" *Commonwealth v. Stokes*, 279 Pa.Super. 361, 367, 421 A.2d 240, 243 (1980) (emphasis added). A gross abuse of discretion is not

demonstrated by merely reciting facts of record that would support a result contrary to the court's actual decision. Review of the certification hearing transcript and order indicates that the court simply weighed the evidence differently than Moss would have liked.

■ Before the court was evidence that Moss had several prior contacts with the juvenile system, which had been "adjusted" without formal proceedings; that he had been charged with six burglaries that were being processed through the juvenile system; and that a *prima facie* case had been established as to three other burglaries, including the present case, which were the subject of the certification hearing. The court took particular notice of the number of burglary charges then pending against Moss and the evidence of how the burglaries had been committed. From their timing and location, the court determined that the burglaries were not isolated incidents; in their planning and execution the court discerned a "high degree of sophistication." The court stated at the hearing that, "I don't think we have ever had a youngster with this number of arrests, burglary arrests, to say nothing of the seriousness of the three cases that I have before me, where a Court has sent him to Saint Gabriel's [one of the facilities that had "accepted" Moss]." N.T. Certification Argument, p. 13. This alone rebuts Moss's argument that the nature of the crime was the sole basis for the court's decision. Instead, the court emphasized the degree of criminal sophistication Moss had apparently developed, and found secure detention necessary, which was unavailable at any facility. It is also rather clear that the court gave limited weight to the letters of acceptance as evidence of amenability to treatment, *see* N.T. Certification Argument, p. 15. Another court hearing the same evidence might have arrived at a decision more favorable to Moss. However, as have the trial court and Superior Court, we find no indication that the certifying judge abused her discretion in ruling as she did.

B.

The affidavit in support of the arrest warrant provided as follows:

On 5/13/81, at about 3:10 a.m., Mr. Robert Reisbard W/M 40, res. 1246 Knorr St. reported a robbery of his residence by point of gun. ·

On 5/20/81, at about 1:40 a.m. the affiant received information from a W/M concerning various crimes in the area of Castor and Knorr. This information was checked with police reports and was found to contain correct and reliable circumstances surrounding these crimes. It is believed by the affiant that the following information is also true and correct.

On or about 5/14/81, the informant overheard a conversation betwen Matt Pettit W/M DOB 5/22/64, of 1322 Knorr St. in which Pettit told Miller that he had committed a robbery of Miller's next door neighbors (sic) house, Mr. Reisbard's residence 1246 Knorr St., and that he felt sorry for Miller because Mr. Reisbard had reported him (Miller) to License and Inspections for repairing autos in the driveway.

Pettit told Miller that Billy Moss was also involved in the Reisbard robbery. He further stated that the males either wore ski masks or stocking masks and that they had a gun. Pettit said that when he pointed the gun at Mr. Reisbard he called him a fat pig. He said that they got into the house by kicking the back door in.

This information coincided with the police report on the robbery Mr. Reisbard handled under DC# C1-2-17456 reported on 5/13/81 at about 3:10 a.m.

The informant then went on to relate detailed information of crimes committed in the second district and also this information was verified by police reports, the following listed locations and times of those crimes:

8/20/80 Burglary Golden Medina Restaurant, 6732 Castor Ave.

8/20/80 Burglary Lamplighter Inn, 6734 Castor Ave.

12/26/80 Burglary of Katz's residence, 1324 Knorr St.

344

12/28/80 Auto theft of Katz's auto, 1324 Knorr St.

Moss argues first that there is no basis in the affidavit for believing that the source of the information, a white male who is not named, is a truthful, reliable person. Because the information tending to establish Moss's involvement with the burglary comes by way of hearsay, additional information demonstrating the reliability of the conduit of this hearsay is required to reduce the possibility that it is merely an unsupported rumor or fabrication.

The affiant stated that he found the informant's statement contained "correct" information about the details of a number of incidents when compared with police reports. Moss suggests that the informant might have been familiar with these facts from newspaper reports, from having examined the police reports, or from having been involved in the incidents himself. He also argues that the informant's statement that Moss was involved in the burglary contains no separate indication of reliability, but is simply an unsupported declaration that he overheard someone claiming responsibility implicate Moss as well.

This approach overlooks longstanding, fundamental principles applicable to review of warrants. Warrant applications must be read in a common sense, non-technical way, "giving due deference to the conclusions of the issuing magistrate." *Commonwealth v. Council*, 491 Pa. 434, 444, 421 A.2d 623, 628 (1980) (search warrant). That other inferences *could* be drawn does not demonstrate that the inference that *was* drawn by the police and the magistrate was unreasonable. As did the suppression judge, the trial judge on post-trial motions, and the Superior Court, we find that the corroboration of details of the informant's statement by comparison with police records gave adequate basis for crediting the whole of the statement as reliable.

Moss also argues that evidence produced at the suppression hearing established that the informant was untrustworthy because he provided the information only after he had been arrested and charged with possession of pills.

This fact, which was not made known in the affidavit, is said to discredit the informant because he was not "a disinterested citizen complainant" who could be assumed to have no reason to falsify information, *Commonwealth v. Stokes*, 480 Pa. 38, 46, 389 A.2d 74, 77 (1978). Instead, argues Moss, it can be inferred that his statement was self-serving, given " 'to ameliorate his own situation.' " *Commonwealth v. Abbruzzese*, 223 Pa.Super. 452, 455, 302 A.2d 853, 854 (1973); *see also, Commonwealth v. Sorrell*, 319 Pa.Super. 103, 112, 465 A.2d 1250, 1255 (1983).

■ Without diminishing the reasoning by which *Stokes, Abbruzzese, Sorrell,* and other cases cited by Moss were decided, we reject the conclusion he urges must follow from applying those cases to the present facts. It has never been held that information supplied by one who is under arrest, implicating others in other crimes, is *per se* unreliable. Rather, the circumstances under which the information was given are part of the information that should be available to the magistrate so that he might make a neutral and detached decision about whether all the information shows probable cause. Moss's challenge then is not that the informant was inherently unreliable because he was under arrest, but that the police misled the magistrate about his reliability by withholding this fact from the affidavit.

We find nothing in the record to support this speculation. At the suppression hearing, Moss was able to establish no more than the obvious fact that the affidavit made no mention of the informant's status; no evidence of coercion of the informant, promises of leniency, or other corrupting influences was produced. The inference that the informant was unreliable remained just that, an inference, that might, but need not, be drawn. (In *Abbruzzese* and *Sorrell* the suppression courts, in the absence of any evidence corroborating reliability, chose to accord the inference great weight.)

 At the same time, it is to be noted that the documentary evidence—i.e., the police report containing the informant's statement—included information that would tend to enhance the likelihood that the informant was reliable. Specifically, the informant implicated himself as a participant in at least one of the incidents, though not the incident for which Moss's arrest warrant was issued. N.T. Suppression Hearing, p. 64. We have acknowledged that a statement against penal interest to someone of authority bears some indication of reliability. *Commonwealth v. Chumley*, 482 Pa. 626, 394 A.2d 497 (1978). Though this evidence was not admissible at the suppression hearing for the purpose of establishing probable cause, Pa.R.Crim.P. 119, it does serve to rebut the inference suggested by Moss that the police selectively omitted information about the informant so as to avoid detracting from his reliability in the eyes of the magistrate. The suppression court, finding no basis for believing that the magistrate was misled in assessing the affidavit, held that the warrant was properly issued. We are not persuaded this was error.

## C.

Moss makes two arguments that the statement he gave to police, implicating himself in the Pigna burglary, was obtained by means contrary to the procedural mandates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny, and thus in violation of the constitutional rights those mandates protect.

According to Moss, he was given the *Miranda* warnings in connection with the one burglary indicated on the arrest warrant, the Reisbard residence at 1246 Knorr Street. He argues that once he denied involvement in that incident (he implicated Matt Pettit as the only participant), the police had to rewarn him of his rights before questioning him about other incidents. The record, however, contains testimony from the interrogating detective that he "informed

him as to the charges, in 1246 Knorr Street, *and about numerous other burglaries that had happened in the area,*" N.T. Suppression Hearing, p. 137 (emphasis added). This testimony was apparently credited by the court, and we have no basis for reassessing the court's conclusion. Because the factual premise of Moss's argument is lacking, we need not rule on the legal effect that would follow if the facts did exist.[1]

 Moss also argues that his statement was obtained in violation of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *Edwards* held that once a person has invoked his constitutional right to counsel, interrogation must cease until counsel is provided. Again, this argument proceeds from a reading of the record inconsistent with the applicable rule of review. An appellate court examining the denial of a motion to suppress must consider the evidence of the prosecution and the evidence of the defendant that, when "fairly read in the context of the record as a whole" remains uncontradicted. *Commonwealth v. Lark,* 505 Pa. 126, 477 A.2d 857 (1984). Moss's assertion that he invoked his right to counsel is based entirely on the testimony of his mother. However, the record also contains the following dialogue between the detective and Moss's attorney:

1. It would appear, however, that the approach suggested would greatly expand the rule of the case on which it is premised, *Commonwealth v. Dixon,* 475 Pa. 17, 379 A.2d 553 (1977). There we invalidated a confession as the product of a waiver of rights not knowingly and intelligently given. Dixon was arrested for failure to abide by a restitution order imposed for a summary conviction, but questioned about the death of her son. Given the ambiguity of the situation, we held that the Commonwealth had not proven she had sufficient "awareness of the *general nature* of the transaction giving rise to the investigation," citing *Commonwealth v. Richman,* 458 Pa. 167, 320 A.2d 351 (1974). We did not hold in *Dixon,* and we have never held, that a suspect must be informed of each and every crime under investigation. On the contrary, we have consistently held that the Commonwealth, in meeting its burden of proving a waiver was knowing and intelligent, may establish the circumstances attending the interrogation and the lack of ambiguity as to the questioning's direction and purpose.

Q. Is it true that while you were reading that to William and his mother, or after you finished reading it, is it true that William said he would like to talk to an attorney?

A. I don't recall that, sir.

Q. You don't know whether it happened or not?

A. It might have happened, sir. I just don't recall it happening.

N.T. Suppression Hearing, pp. 162–63.

We do not accept Moss's argument that his mother's testimony that he asked for an attorney remains uncontradicted when fairly read in the context of the record as a whole. Much of the import of the detective's responses depends on their inflection and tone, characteristics not subject to review from a transcript. It is well within reason to interpret the detective's words as being a definite negative, subject only to the acknowledgment of a possible fault of memory—in essence, "Maybe what you say is true, but I don't recall it that way." Giving due deference to the conclusions of the suppression judge, who heard all the witnesses, was best able to pass on their credibility, and rejected Moss's claim, we must likewise reject this argument.

█ Even were we to assume that Moss did ask for counsel, *Edwards* would not compel the suppression of his statement. The kind of police misconduct that resulted in suppression in *Edwards* was badgering, harassing insistence that the suspect make a statement during a long interval of incarceration when counsel was unavailable. In *Commonwealth v. Hubble*, 509 Pa. 497, 504 A.2d 168 (1986) (plurality opinion), it was noted that *Edwards* does not erect a "cone of silence" around a suspect with the simple utterance of the word lawyer. Courts must still determine, from all the circumstances, whether the suspect intentionally relinquished a known right. In *Edwards*, the Court sup-

pressed the fruits of a police initiated interrogation undertaken hours after the suspect had clearly stated that he wanted legal counsel, and only moments after he had said he didn't want to talk to anyone. The police response was that he had to talk to them. The present facts reveal no similar insistence by the police that Moss answer questions despite a previous invocation of his rights to counsel and to remain silent.

■■■ It cannot be ignored that at the time Moss was arrested, *Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1975), required that he be provided with an opportunity to confer with a parent or other informed, interested adult before being questioned. In compliance with this rule, the detective read the warning card to Moss in the presence of his mother, and then gave them an opportunity to confer in private before questioning Moss as to his understanding of the rights. It would require mechanical jurisprudence of the worst sort to find that the latter set of questions, designed to insure that Moss understood the rights that had been read and to ascertain whether he wished to invoke them, constitute police-initiated interrogation of the sort forbidden by *Edwards*. Nor can we accept Moss's implication that by having him confer with his "distraught" mother, after which he waived rights he allegedly had previously asserted, the police improperly pressured him to reconsider. The suppression court's determination that Moss understood his rights to remain silent and to have counsel present, and freely waived them, is supported by the record and will not be disturbed.

Finding no error in the decisions of the courts below, we will affirm the order of the Superior Court.

It is so ordered.

STOUT, J., did not participate in the consideration or decision of this case.

LARSEN, J., concurred in the result.