602 A.2d 371

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Myla FRIEDMAN, Appellee.**

Superior Court of Pennsylvania.

Argued June 18, 1991.

Decided Jan. 22, 1992.

630

Mary B. Seiverling, Deputy Atty. Gen., Harrisburg, for Com., appellant.

Dennis J. Cogan, Philadelphia, for appellee.

Before ROWLEY, President Judge, and CAVANAUGH and WIEAND, JJ.

CAVANAUGH, Judge:

This is a Commonwealth appeal from an order of the lower court granting a suppression motion.[1] A statement made by appellee and videotapes taken from her apartment were suppressed after the Honorable Juanita Kidd Stout found that the investigating officers violated appellee's rights as guaranteed by the fourth, fifth, sixth, and fourteenth amendments to the U.S. Constitution. After the conduct of an evidentiary hearing, Judge Stout determined

1. The Commonwealth has certified that the prosecution of the case is substantially handicapped by the effect of the suppression order. *Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985); *Commonwealth v. Lindsay,* 406 Pa.Super. 638, 595 A.2d 86 (1991).

that the statement made by appellee at police headquarters was the product of custodial interrogation and that appellee did not knowingly, intelligently, and voluntarily waive her rights to remain silent and to be represented by counsel during questioning.[2] Specifically, the court found that the failure of the assigned detective to inform appellee that the victim of the shooting had died prior to her waiver of rights renders the waiver ineffective. Regarding the search, the warrant did not specify videotapes to be seized, and, therefore the court found they were not within the scope of the warrant.

On November 26, 1989, appellee shot and killed Bryan Edwards. The shooting occurred in the bedroom of appellee's apartment. Appellee summoned the police to her residence and reported to them that she had been raped by Edwards and she shot him to protect herself. Appellee was taken to police headquarters where she was questioned by a homicide detective. She recited a history of difficulties with the victim, her boyfriend until of late, and explained the occurrence of the shooting. After approximately ten hours at the police station, she left with her family. She was arrested on homicide charges on January 12, 1990. Appellee was also charged with arson for the firebombing of the victim's automobile thirteen days before the killing. The hearing on the suppression motion was on November 1 and 2, 1990. By order signed November 20, 1990, Judge Stout joined all charges for trial and made the suppression order applicable to both the murder and arson cases.[3]

The scope and standard of review of an order suppressing evidence is well-established:

> We must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole

**2.** The oral statements made by appellee in her apartment were not challenged and were not subject to the suppression order.

**3.** The Commonwealth was represented by the state Attorney General's Office since Ms. Friedman, a law student, had worked as a legal intern in the Philadelphia District Attorney's Office for the three-month period preceding the killing.

remains uncontradicted. *Commonwealth v. Hamlin*, 503 Pa. 210, 469 A.2d 137 (1983) (plurality opinion). While we are bound by the [suppression] court's findings of fact if supported by the record, we are not bound by the court's legal conclusions which are drawn from the facts of the case. *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111 (1985).

*Commonwealth v. Lagana*, 517 Pa. 371, 375–376, 537 A.2d 1351, 1353–1354 (1988). *See also, Commonwealth v. James*, 506 Pa. 526, 532–533, 486 A.2d 376, 379 (1985); *Commonwealth v. Person*, 385 Pa.Super. 197, 200, 560 A.2d 761, 762–763 (1989). "We will ... affirm the decision of the suppression court 'if it can be sustained for any reason whatsoever, even if the [suppression] court offered an erroneous reason to support its action.'" *Commonwealth v. Bowers*, 400 Pa.Super. 377, 381, 583 A.2d 1165, 1167 (1990), quoting *Commonwealth v. Reidenbaugh*, 282 Pa.Super. 300, 309–310, 422 A.2d 1126, 1131 (1980). *See also: Commonwealth v. Shaw*, 494 Pa. 364, 368 & n. 1, 431 A.2d 897, 899 & n. 1 (1981); *Commonwealth v. Nelson*, 320 Pa.Super. 488, 493–494, 467 A.2d 638, 641 (1983).

*Commonwealth v. Bagley*, 408 Pa.Super. 188, 193, 596 A.2d 811, 813 (1991).

 When the defendant fails to present any witnesses, the uncontradicted evidence submitted by the Commonwealth shall be considered on review. *Commonwealth v. Davis*, 407 Pa.Super. 415, 595 A.2d 1216 (1991).

In keeping with its obligation to enter a statement of findings of fact, Pa.R.Crim.P. 323(i), the lower court made the following findings of fact, relevant to the statement, which are supported by the record:

1. About 1:22 p.m., Sunday, November 26, 1989, police responded to a call from the second floor rear apartment, 1830 Green Street, Philadelphia, Pennsylvania.

2. Upon their arrival, they discovered the defendant, Myla Friedman, was present and that the victim, Bryan Edwards had been shot. He was removed to Hahne-

mann Hospital where he was pronounced dead at 2:05 p.m.

3. At 2:25 p.m. the defendant was transported to Homicide Division of the Philadelphia Police Department by Sgt. Kelley. There she met Detective Guster Richardson.

4. Detective Richardson completed Form 72–229 on which he recorded biographical data including the fact that the defendant had a Bachelor's Degree from Temple University and was a student at the Law School of Temple University. He also noted that the defendant did not appear to be under the influence of drugs.

5. After Form 72–229 was completed, Detective Richardson gave defendant the *Miranda* warnings, asked the *Miranda* questions, and received answers which indicated the defendant wished to give a voluntary statement.

6. Even though Detective Richardson knew at the time he read the *Miranda* warnings that the victim was dead, having been told of that fact by other officers at the scene, and despite the fact that the defendant asked him a couple of times whether or not the victim was dead, Detective Richardson told her that the victim was in grave condition and urged her to speak to him as quickly as possible.

Detective Richardson then proceeded, at 3:12 p.m., to tell the defendant that he was questioning her about "the shooting of Bryan Edwards."

7. The defendant gave Detective Richardson a brief oral recitation of what happened in her apartment and then gave him a 15–page statement followed on a 16th page by a sketch of her apartment.

8. The written statement was begun at 3:25 p.m., one hour and twenty minutes after the victim had been pronounced dead.

9. The defendant was given water between 3:55 and 4:00 p.m., at which time the statement was resumed.

The defendant was taken to the ladies' room at 4:40 p.m. and the statement continued at 4:46 p.m.

10. At 5:30 p.m., Mrs. Pamalyn Friedman, the defendant's stepmother, her son and sister, arrived at the Police Administration Building from Mt. Vernon, New York and sought to see the defendant but were denied permission. Instead, they were directed by the detectives, one of whom gave Mrs. Friedman his card, to Chinatown for dinner. They followed the detectives' suggestion, went to dinner but returned to the Police Administration Building some one and a half hours later again to be denied permission to see the defendant.

11. Mrs. Friedman inquired as to whether the defendant had been raped and was told by one of the detectives that there had been no rape but that the sexual relations had been voluntary.

12. At 5:45 p.m., two hours and twenty minutes after the statement had begun, the defendant was told that the victim had died.

13. The defendant was not rewarned of the *Miranda* rights for the shooting death rather than a shooting about which she had been warned earlier.

14. Even though the defendant had appeared somewhat upset at the beginning of the statement, when she was being questioned about a shooting, she became more upset upon learning of the victim's death and she began to cry.

15. The defendant declared she had been raped and cut but the detectives made no effort to verify the claim of rape.

At 6 p.m., they did have her checked by a policewoman, Carmen Ortiz, to determine whether she had been cut as she claimed. The defendant indicated she did not wish to go to the hospital.

16. At 6:05 p.m., the defendant was given water and she remained alone until 6:25 p.m., when the statement was resumed. It was completed at 6:40 p.m.

17. Between 6:40 and 7:10 p.m., the defendant read the statement and between 7:10 and 7:15 p.m. she made corrections on the statement and signed it.

18. From 7:15 to 10:25 p.m. the defendant was alone. During that time, she was given a note from her husband, Walter Kusmenko, was taken to the ladies' room and twice was given water.

19. At 10:25 p.m., the defendant requested to speak to Officer Carmen Ortiz, and she was alone between 10:30 and 10:50 p.m.

20. At 10:50 p.m., the defendant was taken by Officer Ortiz to the Identification Unit for photographs of her scarred chest. There she remained until 11:20 p.m.

21. Even though Jerry Friedman, the defendant's uncle, was present at the Roundhouse during part of the time the defendant was being questioned, the defendant only saw him as she passed the waiting area where he was seated while she was on the way to have her chest photographed.

22. From 11:20 to 11:28 p.m., the defendant was alone.

23. From 11:28 p.m., Detective Richardson and Sgt. Finn asked the defendant to extend the interrogation time. At 11:38 p.m., she signed a rather inartistic [sic] form which said, among other things:

 I want to continue to talk with the police and tell them what I know. Also that anything that I know, and that I say, can and will be used against me in court.

24. The questioning resumed and three and a half additional pages were written. The statement was completed, read and signed at 12:36 a.m., November 27, 1989.

25. At 12:38 a.m., November 27, 1989, the defendant was released and she left with her uncle after having been in custody ten hours and thirteen minutes.

Notes of Testimony, Nov. 2, 1990, 199–204.

After making these factual findings, the lower court concluded that suppression of the statement was

mandated by the federal constitution.[4] The court determined that since appellee was only advised she was being questioned about a "shooting" and not about a "shooting death" or murder, she was not aware of the general nature of the transaction giving rise to the charges. The court reasoned as follows:

> The transaction is not of the same nature. A shooting is an aggravated assault and battery, a felony of the second degree, for which the sentence may range from a fine not to exceed $25,000, or a sentence of not more than ten years, or both. A shooting death is a homicide for which a conviction of murder in the first degree mandates a sentence of life imprisonment or death. The difference between the two crimes is of such distinction and dynamic difference, physically and legally, that if the death of the victim is known by the interrogator at the time the waiver is signed, the interrogator must advise the suspect of the death and not merely of the aggravated assault.

Lower Court Opinion, November 14, 1990, at 9.

The conclusion reached is not supported by the law and is an inadequate basis upon which to order suppression of appellee's statement.[5]

4. The lower court only considered the application of the federal constitution to appellee's claims of violation of her rights. This limitation to federal law was clearly proper since appellee only alleged violation of the United States Constitution in her omnibus pretrial motion and in all oral presentations before the lower court. Nowhere did defense counsel state that reliance was placed upon guarantees in the state constitution; nor has there been any discussion, on a substantive level, of whether there exists any difference between the protections offered by the federal and state constitutions. Therefore, our analysis is confined to federal law. *See, Commonwealth v. Santiago*, 528 Pa. 516, 599 A.2d 200, 201, n. 7 (Pa.1991).

5. The lower court found that appellee was subject to custodial interrogation for *Miranda* purposes. On appeal, the Commonwealth argues that the appellee was not under arrest or in custody during her presence at the Police Administration Building. We are inclined to agree with the lower court that appellee could reasonably believe she was not free to leave police headquarters during the period of interrogation. Given the adequacy of the *Miranda* warnings, we do not rule whether appellee was in custody or not, but rather we assume *arguendo* that she was in custody and entitled to the protection of *Miranda* warnings.

The United States Supreme Court addressed the issue of a suspect's being warned of the scope of interrogation in *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). In *Spring,* the defendant was arrested after he sold stolen firearms to undercover agents of the Bureau of Alcohol, Tobacco & Firearms. Prior to this arrest, an informant had told the agents that Spring had killed a man in Colorado. After Spring was advised of his *Miranda* rights, he waived them all and signed a statement that he was willing to answer questions. After the agents asked him about the firearms transaction, they asked him if he had ever shot anyone. Spring indicated yes, but denied any knowledge of the Colorado killing. Two months later state officers questioned Spring. He again waived his rights, and then confessed to the killing. The issue before the Supreme Court was whether the first statement was obtained under circumstances which violated *Miranda* since Spring had not been informed of potential subjects of interrogation. The Court found that it had not.

The Court held, "a suspect's awareness of all the possible subjects of questioning in advance of questioning is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." 479 U.S. at 577, 107 S.Ct. at 859, 93 L.Ed.2d at 968. Although held on a firearm charge, Spring could validly waive his *Miranda* rights without being informed that the police were investigating a murder and that the questioning related to the murder investigation.

Pennsylvania state court cases, decided both before and after *Spring,* apply the Fifth Amendment and reach the same result. In *Commonwealth v. Dixon,* 475 Pa. 17, 379 A.2d 553 (1977), the supreme court stated that there was no requirement that interrogating officers affirmatively provide information to the suspect as to the crime under investigation; rather the Commonwealth must show that the defendant knew of the occasion for the interrogation. The court imposed upon the Commonwealth the burden of

showing by a preponderance of the evidence that the suspect is aware of the subject matter of the interrogation.

This burden may sometimes be satisfied by the establishment of circumstances attending the interrogation, such as the prior statements of the suspect, *see Commonwealth v. Cooper, supra,* [444 Pa. 122, 297 A.2d 108], or that fact that interrogation follows hard upon the criminal episode and there is no circumstance lending ambiguity to the direction and purpose of the questioning.

*Id.,* 475 Pa. at 23, 379 A.2d at 556.

In *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288 (1983), the court reiterated the standard that a suspect must have " 'an awareness of the general nature of the transaction giving rise to the interrogation,' in order to make an intelligent and understanding waiver of his rights." *Id.,* 502 Pa. at 485, 467 A.2d at 293, quoting *Dixon,* 475 Pa. at 22, 379 A.2d at 556. The defendant in *Travaglia* claimed that his waiver of *Miranda* rights was invalid because the pre-interrogation warning form listed only firearms and resisting arrest charges. The court found that even if the officers did not tell the suspect that, in addition to violation of the Uniform Firearms Act and recklessly endangering another person, four homicides were under investigation it was not possible to find an ambiguity in the suspect's mind about the purpose of the interrogation. The court held that the facts that the interrogation was on the same day as the most recent homicide and that the defendant and a co-defendant had handed the weapon used in that homicide to police less than an hour before arrest clearly established that the defendant was aware of the general nature of the transaction. It stated that to find otherwise would be patent hypothesis and fantasy. *Id.,* 502 Pa. at 487, 467 A.2d at 294.

In *Commonwealth v. Moss,* 518 Pa. 337, 543 A.2d 514 (1988), the supreme court noted that it has *never held* that a suspect must be informed of each and every crime under investigation. *Id.,* 518 Pa. at 341, n. 1, 543 A.2d at 519, n. 1. It affirmed that the standard for proving a knowing and

intelligent waiver was establishment of the circumstances attending the interrogation and the lack of ambiguity as to the questioning's direction and purpose.

This court in *Commonwealth v. Carr*, 398 Pa.Super. 306, 580 A.2d 1362 (1990) found that where a suspect is arrested on a fugitive warrant and waives his *Miranda* rights, he may be questioned about a shooting which resulted in a woman's death.

In examining the circumstances of this case we find there can be no question but that appellee was aware of the general nature of the transaction about which she was interrogated. Appellee was fully aware that she shot Bryan Edwards, that he had shown no signs of life when he was taken by the emergency personnel from her apartment to the hospital, and that it was this transaction that the police were interested in. Whether the victim was known to be dead or alive is a fact of no legal consequence in consideration of appellee's waiver of her *Miranda* rights. Even if it were, the waiver of rights form signed by her stated that she was in the homicide division of the police department and that the interrogator, Detective Richardson, was a homicide detective. The questioning took place within two hours of the police arrival at appellant's apartment and discovery of the victim.

The appellee argues that police deception or trickery caused her waiver of rights to have been made unknowingly and unintelligently. The appellee points to Detective Richardson's evasive answer that Edwards was in "grave condition" when appellee asked on several occasions if he was okay. This is not the sort of police subterfuge which would vitiate the validity of the waiver. To render a confession inadmissible the police fabrication must be likely to cause it to be untrustworthy. *Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264 (1989). Since appellee was not legally entitled to know whether the victim was still alive or not, *see supra*, that Detective Richardson gave her a possibly incomplete answer to her inquiries does not cause the confession to be untrustworthy. Appellee knew at the

time of questioning that she had shot Edwards in the neck. She was present in her apartment as unsuccessful emergency efforts were made to resuscitate him. She knew she was being questioned by a homicide detective. Nothing said by Detective Richardson in response to appellee's inquiries about Edwards was trickery going to the trustworthiness of appellee's confession. *See, Commonwealth v. Danforth,* 395 Pa.Super. 1, 69, 576 A.2d 1013, 1047–1048 (1990) (Kelly, J., dissenting) (collecting cases upholding confessions after police had supplied false information.)

■ We find that the lower court erred in concluding that appellee had to be told that it was a "shooting death" under investigation before her waiver of *Miranda* rights was valid.[6]

■ In the alternative, the appellee argues that deviation from the *Miranda* warnings constituted an improper inducement for her to waive her rights. She points to Detective Richardson's statement that "it was very important to her" if the police could speak with her and find out what happened in her apartment.

**6.** Unexplained is the failure of the lower court to consider *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), and the state court precedent cited above. (The Commonwealth referred to *Spring* during argument at the suppression hearing.) These cases had all been decided prior to the November 2, 1990 order and the November 14, 1990 opinion. The misapplication of the law by the lower court is made yet clearer by two cases decided after the date of its opinion. Our supreme court recognized in *Commonwealth v. Santiago,* 599 A.2d 200 (Pa.1991) that the Fifth Amendment right to counsel was "non-offense-specific", as held in *McNeil v. Wisconsin,* 501 U.S. ——, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). These cases pertain to a suspect's request for counsel and whether the presence of counsel is required after a suspect invokes the Fifth Amendment right to counsel during a prior questioning session concerning a different offense. In *Santiago,* the court held that although different offenses were involved, the invocation of the right to counsel under the Fifth Amendment was not offense specific, and, therefore, subsequent questioning was impermissible.

 Because we find that the initial warnings were adequate, we do not reach the issue regarding the re-warning at 11:28 p.m. Appellee never requested an attorney or sought to terminate the interrogation. No re-application of the *Miranda* warnings was required.

Initially, we note that the strict incantation of *Miranda* rights upon which appellee bases her argument has been rejected by the U.S. Supreme Court. The case *Commonwealth v. Johnson*, 484 Pa. 349, 399 A.2d 111 (1979) cited in appellee's brief was referred to in *Duckworth v. Eagan*, 492 U.S. 195, 201, n. 2, 109 S.Ct. 2875, 2879, 106 L.Ed.2d 166, 175–176, n. 2 (1989) as being among the state court cases which have incorrectly found that language that "if and when you go to court a lawyer will be appointed" did not satisfy *Miranda*. On the contrary, *Duckworth* held that *Miranda* warnings are not defective which inform a suspect that a lawyer will be appointed "if and when you go to court." Therefore, reliance upon the holding and rationale of *Johnson* is no longer appropriate.

There is no question that appellee was fully informed of her *Miranda* rights.[7] The question is whether being told it was important to her to speak to Detective Richardson affected the validity of the waiver. To decide this issue the context in which the statement was made must be considered. The suppression court found that Detective Richardson told appellee it was important that she speak with him as quickly as possible before he took basic biographical information from her, recorded on Form 75–229, and before he began to advise her of her *Miranda* rights. There is no requirement that a suspect be advised of any *Miranda* rights where the police seek biographical, general information for completion of a Form 75–229. *Commonwealth v. Jasper*, 526 Pa. 497, 587 A.2d 705 (1991).

We find that Detective Richardson's statement was not a sufficient inducement to render appellee's waiver invalid. He made no promise of a benefit or of special consideration

7. Unlike the appellee, the defendant in *Commonwealth v. Singleton*, 439 Pa. 185, 266 A.2d 753 (1970) was never properly informed of his *Miranda* rights. Instead, he was told his statements could be used *for* or *against* him. This misinformation is perhaps not surprising since Singleton was warned of his constitutional privileges on April 17, 1966, and *Miranda* was decided on June 13, 1966. We do not find this case apposite to the one at bar where a complete, correct rendition of rights was given.

as he administered the warnings. Nor did he make such representations after he accurately informed appellee of all her Fifth Amendment rights and asked her specific questions regarding her understanding and waiver of those rights. There is no indication in the record that appellee did not understand her rights nor that she placed any importance upon the detective's earlier statement. This lack of any demonstrable concern or confusion on appellee's part regarding her right to remain silent or her right to counsel distinguishes this case from *Commonwealth v. Gibbs*, 520 Pa. 151, 553 A.2d 409 (1989). In *Gibbs*, the statement found to be an inducement was made to defendant after he was read his rights and after he asked a question, "What good would it do me to tell you?" This sequence of events rendered the detective's response of possible benefit by telling the court of defendant's cooperation an inducement.

The statement at issue was uttered prior to the commencement of warnings and even prior to the gathering of biographical information. There is no causal link between it and appellee's decision to waive her rights. It did not constitute an inducement to waive them.

For the above reasons, we find that the lower court committed legal error in suppressing appellee's written statement. We reverse that portion of the order regarding the statement.

The second aspect of the lower court's order before us for review is the suppression of physical evidence. The Commonwealth alleges that the items seized, particularly videotapes,[8] were obtained pursuant to a valid search warrant, or alternatively, were subject to the plain view doctrine.[9] The lower court held that lack of particularity in the warrant requires suppression of all items not specifically mentioned within the four corners of the warrant.

8. These tapes, although not included in the certified record to this court, have been described as "video love letters", one being from the victim to the appellee and the other from the appellee to the victim.

9. There is no issue regarding probable cause for the issuance of the warrant.

 The search warrant identifies the following items to be searched for and seized:

Photos, sketches, 38 caliber revolver and other evidence of a crime, blood

The probable cause section of the affidavit states as follows:

On Sunday, November 26, 1989, at 1:29 P.M., police of the 9th District responded to a radio call "1830 Green Street 2nd floor rear rape in progress." Police officer Dorsey Lay # 5301 responded and upon his arrival he gained entry to the apartment, at which time he observed a black male lying on the bed with a wound on the left side of his neck. The male was partially covered and a knife was laying on his chest. The officer also observed a silver 38 caliber revolver lying on the floor, near the closet. Rescue arrived and transported the victim who was identified as Bryan Edwards, to Hahnemann Hospital. Edwards was treated and pronounced dead at 2:05 P.M. by Dr. Brzozowski.

It is requested that this search and seizure warrant be approved for the purpose of processing the scene.

The warrant states that the violation is murder.

The order entered on November 2, 1990 provided that, "Written statements and videotapes are suppressed along with any thing not particular [sic] mentioned within the 'four corners' of the search warrant."

This court has recently conducted a thorough analysis of the particularity requirement of a search warrant. In *Commonwealth v. Bagley*, 408 Pa.Super. 188, 596 A.2d 811 (1991), we examined relevant federal and state constitutional provisions and case law pertaining to the need to particularly identify "as nearly as may be" possible items to be seized. As noted in *Bagley*, the supreme court's decision in *Commonwealth v. Grossman*, 521 Pa. 290, 555 A.2d 896 (1989) lays out the standard for determining compliance with the particularity requirement:

The language of the Pennsylvania Constitution requires that a warrant describe the items to be seized "as nearly as may be...." The clear meaning of the language is that a warrant must describe the items as specifically as is reasonably possible. This requirement is more stringent than that of the Fourth Amendment, which merely requires particularity in the description. The Pennsylvania Constitution further requires the description to be as particular as is reasonably possible. *See Commonwealth v. Reese*, 520 Pa. 29, 31–32, 549 A.2d 909, 910 (1988) (Nix, C.J., dissenting) (Pennsylvania particularity requirement more stringent than that of the Fourth Amendment because Pennsylvania particularity requirement precedes probable cause requirement).

It is settled Fourth Amendment jurisprudence that a warrant must specifically list the things to be seized. *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). The more rigorous Pennsylvania constitution provision requires no less.

Although some courts have treated overbreadth and ambiguity as distinct defects in warrants, e.g. *Commonwealth v. Santner*, 308 Pa.Super. 67, 68 n. 2, 454 A.2d 24, 25 n. 2 (1982), both doctrines diagnose symptoms of the same disease; a warrant whose description does not describe as nearly as may be those items for which there is probable cause. Consequently, in any assessment of the validity of the description contained in a warrant, a court must initially determine for what items probable cause existed. The sufficiency of the description must then be measured against those items for which there

was probable cause. Any unreasonable discrepancy between the items for which there was probable cause and the description in the warrant requires suppression. An unreasonable discrepancy reveals that the description was not as specific as was reasonably possible.

*Commonwealth v. Grossman*, 521 Pa. 290, 296–297, 555 A.2d 896, 899–900 (1989) (footnote omitted).

*Id.*, 408 Pa.Superior Ct. at 196–197, 596 A.2d at 814–815.

In *Bagley*, the warrant was issued for, "Address book of decedent, a diary of decedent, or other materials providing names and addresses of relatives or persons close to the decedent...." *Id.*, 408 Pa.Superior Ct. at 206–208, 596 A.2d at 820. Taken pursuant to this warrant were, *inter alia*, the following:

(3) one letter found in kitchen dated 4/4/89 signed Charles Bagley; (4) one envelope found in Kitchen–Selective Insurance, New Jersey; (5) one telephone bill dated 3/21/89 found in kitchen; (6) airplane baggage claim tickets for Pan Am # 822635; (7) paper with passport information and business card for travel agency; (8) address book found in living room; (9) Century 21 name tag from John Matthews, Inc. Realtors; (10) note from front door of residence from Sonja White; (11) various phone numbers and addresses; (12) letter from Honeywell Protection Services to Charles Bagley; and (13) letter from Barclays Bank in England dated 3/13/89.

*Id.*, 408 Pa.Superior Ct. at 207, 596 A.2d at 820.

This court affirmed suppression of the above items because they did not constitute evidence of the commission of a crime. Similarly, in the instant case we conclude that the videotapes were not evidence of a crime, nor were they described "as nearly as may be" in the warrant. The affidavit accompanying the warrants adds nothing in terms of particularity, but merely states that the search and seizure warrant was sought for the "purpose of processing the scene."

We reject the Commonwealth's argument that the videotapes are encompassed within the designation "photos."

From reading the warrant and affidavit we agree with the lower court that in order to seize the tapes the officers would have had to describe them more particularly in the warrant. From the context of the warrant it would seem that the "photos and sketches" referred to would be taken by the police officers in the processing of the crime scene and would constitute "visual information" authorized by the search warrant. *See, id.,* 408 Pa.Superior Ct. at 212, 596 A.2d at 823. Certainly the sort of rummaging cautioned against by this court in *Commonwealth v. Santner,* 308 Pa.Super. 67, 454 A.2d 24 (1982) cited in *Bagley,* 408 Pa.Super. at 194, 596 A.2d at 814 would be sanctioned were we to adopt the Commonwealth's reasoning. To apply the interpretation urged by the Commonwealth would allow officers "to pick and choose among an individual's possessions to find which items to seize."

For the above reasons we affirm the suppression order as it relates to the videotapes.

The final matter before us is the remainder of the physical evidence, other than the videotapes. In its opinion, the lower court only referred to the videotapes. Its order did extend to anything not in the four corners of the warrant. From our review of the warrant, affidavit, and property receipts, it appears that nothing else that was seized went beyond the four corners of the warrant.

The order is reversed insofar as it suppressed the statement made by appellee. The order is affirmed as it relates to the videotapes. Case remanded for proceedings not inconsistent with this opinion. Jurisdiction relinquished.