J-A17031-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LUCKENSON DESRIVIERES | |
| Appellant | No. 2328 EDA 2013 |

Appeal from the Judgment of Sentence entered July 8, 2013
In the Court of Common Pleas of Montgomery County
Criminal Division at No: CP-46-CR-006042-2012

BEFORE:  GANTMAN, P.J., PANELLA, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 09, 2014**

Appellant, Luckenson Desrivieres, appeals from the judgment of sentence of the Court of Common Pleas of Montgomery County entered July 8, 2013.  Appellant challenges the voluntariness of his waiver of his privilege against self-incrimination, arguing it was unlawfully induced.  We disagree.  Accordingly, we affirm.

The trial court summarized the relevant factual and procedural history of the case as follows:

> A Criminal Complaint was filed on June 19, 2012, against [Appellant] for actions that occurred on June 14, 2012 at 1218 Arch Street in Norristown, Pa.  These actions resulted in the murders of Marc Estiverne and Shamara Hill.  [Appellant] was not arrested immediately because his whereabouts were unknown.  However, after enlisting the help of the Federal Bureau of Investigation, the United States Marshals, and the Department of Homeland Security due to the belief that [Appellant] had fled the state of Pennsylvania, he was located on July 11, in Irvington, New Jersey.

On July 11, 2012, Special Agent Ricky Miller (hereinafter "Agent Miller") from the Department of Homeland Security, other members of his office, and the United States Marshals Fugitive Task Force took [Appellant] into custody in Newark, New Jersey. Agent Miller was already familiar with [Appellant] because in May 2010, he made a visit to him at a New Jersey correctional facility upon learning that [Appellant] might be able to provide useful information in an ongoing investigation the Department of Homeland Security was conducting regarding a gang located in the Newark area. After this visit, [Appellant] agreed to work with Agent Miller as an informant to help advance Homeland Security Investigations, and in return, his final order of deportation was stopped.

[Appellant] was also given the opportunity to receive monetary awards for work he completed for Homeland Security. In his capacity as a confidential informant, [Appellant] conducted controlled buys of drugs from December of 2010 until April 2011, when the subjects of the investigation were arrested. In the days leading up to the culmination of Agent Miller's investigation, he told [Appellant] "that he should go lay low for a while and just get out of the area." More specifically, he was to avoid the Newark and Irvington, New Jersey region. Therefore, [Appellant] decided to go to Norristown, Pa. to live with a girlfriend. Agent Miller instructed [Appellant] to keep in contact with him, call 911 if there was ever an emergency, and to notify Agent Miller and Homeland Security if he felt threatened in any way.

On June 18, 2012, Agent Miller received notification from Montgomery County Detectives that they had an outstanding murder warrant for [Appellant]. After calling [Appellant] and members of his family numerous times to no avail, Agent Miller received consent to search 182 Myrtle Street in Irvington, New Jersey on July 11, 2012. Upon searching this residence, Agent Miller found [Appellant] hiding in a box in the basement. Thereafter, [Appellant] was arrested and taken into custody by Homeland Security around 11:00 am.

Montgomery County Detectives were notified of [Appellant]'s apprehension and he was subsequently placed in the processing area of the Homeland Security Office where he was interviewed by Agent Miller who asked "biographical questions" to verify and update the information in their system pertaining to [Appellant]. It was at this point that [Appellant] blurted out that he had committed two murders and continued to detail the events of June 14, 2012. While this was occurring,

Agent Miller said to him, "You know you have rights. You don't have to tell us any of this stuff." However, [Appellant] continued to talk. After he finished recounting the events of June 14th, [Appellant] then said "I might as well just kill myself." Agent Miller told him that detectives from Montgomery County were coming to speak with him, and that "[b]asically what you need to do is answer their questions, tell them the truth, and you should be okay."

Once Lieutenant James McGowan, Detective Paul Bradbury, and Detective Eric Gergel from Montgomery County arrived, Agent Miller briefly spoke with Lieutenant McGowan to relay the events that occurred prior to their arrival. Detective Bradbury on the other hand did not speak to Agent Miller or Lieutenant McGowan about what took place before they arrived at Homeland Security. Shortly, after their arrival, Detective Bradbury gave [Appellant] the Miranda warnings and after he consented to give a statement, Detective Bradbury began to interview in a question-answer format. After the written question and answer portion of [Appellant]'s interview was finished, he consented to provide a videotaped statement for Detective Bradbury and Detective Gergel.

Trial Court Opinion, 10/16/13, at 1-4 (citations to notes of testimony omitted).

After the trial court denied his motion to suppress, Appellant's case proceeded to a trial before a jury. The jury convicted Appellant of several crimes, including one count of first degree murder, and one count of third degree murder. Appellant was sentenced accordingly. This appeal followed.

On appeal, Appellant raises the following question for our review:

Whether the trial court erred in denying the Motion to Suppress evidence because the statements made by [Appellant] to Montgomery County Detectives were unlawfully induced by a promise by Federal [A]gent Ricky Miller that "everything would be okay if he answered the detectives' questions" in violation of his State and Federal constitutional rights as secured by Article I, Section[s] 8 and 9 of the Pennsylvania Constitution, and the

- 3 -

Fourth, Fifth, and Sixth Amendments to the United States Constitution, and in violation of Miranda v. Arizona?

Appellant's Brief at 4.

Appellant argues his confession to the Montgomery County detectives was unlawfully induced by Agent Miller's promise,[1] and the trial court erred in not suppressing it.[2] Specifically, Appellant argues the confession was obtained in violation of **Miranda v. Arizona**, 384 U.S. 436 (1966).[3] To this

_____

[1] Appellant is not challenging the incriminating statements he made to Agent Miller, but only those made to the detectives. Appellant, however, notes at the time he made these statements he had not been given the **Miranda** warnings, "because Agent Miller was not just any law enforcement officer to [Appellant] but someone in a special position of trust to [A]ppellant." Appellant's Brief at 20. We will address the question of the relationship between Agent Miller and Appellant **infra**. Here, we note Appellant made the incriminating statements to Agent Miller while he was gathering biographical information from Appellant. "There is no requirement that a suspect be advised of any **Miranda** rights where the police seek biographical, general information[.]" **Commonwealth v. Friedman**, 602 A.2d 371, 378 (Pa. Super. 1992). **See also Commonwealth v. Garvin**, 50 A.3d 694, 698 (Pa. Super. 2012) ("Generally speaking, general information such as name, height, weight, residence, occupation, etc. is not the kind of information which requires **Miranda** warnings since it is not information generally considered as part of an interrogation") (citation omitted).

[2] "In reviewing a suppression ruling, this Court is bound by the lower court's factual findings that find support in the record but we are not bound by the court's conclusions of law. The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review." **Commonwealth v. Templin**, 795 A.2d 959, 961 (Pa. 2002) (citations omitted).

[3] **See Commonwealth v. Jones**, 322 A.2d 119, 124 n.7 (Pa. 1974) ("recognizing distinction between coerced confession claim and claim that confession is inadmissible under **Miranda**[.]"); **see also Templin**, 795 A.2d at 966. Appellant is not challenging the voluntariness of his confession, only the voluntariness of his waiver.

end, Appellant argues that the close relationship between Agent Miller and Appellant and the fact Agent Miller kept his past promises to secure two extensions of his immigration status and paid him over $20,000 for his undercover work "in exchange for his cooperation[,]" poisoned Appellant's waiver. Appellant's Brief at 20. In support, Appellant cites *Commonwealth v. Williams*, 650 A.2d 420, 427 (Pa. 1994), *Commonwealth v. Levanduski*, 907 A.2d 3, 24 (Pa. Super 2006), and *Commonwealth v. DiStefano*, 782 A.2d 574, 579 (Pa. Super. 2001), for the proposition that a "long line of Pennsylvania appellate decisions have repeatedly held that the focus of the [voluntariness] analysis is not the subjective motives of the police officer, but rather on the objective impact of the officer's actions on the state of mind of the suspect." Appellant's Brief at 21-22.

For the reasons stated below, we conclude the trial court did not err in denying Appellant's motion to suppress the confession.

> In determining whether a defendant's waiver of his *Miranda* rights is valid, a trial court must consider: (1) whether the waiver was voluntary, in the sense that the waiver was not the result of governmental pressure; and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice. The Commonwealth bears the burden of establishing that a defendant knowingly and voluntarily waived his *Miranda* rights. Factors to be considered in determining whether a waiver is valid . . . include: the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other facts which may serve to drain one's powers of resistance to suggestion and coercion.

*Commonwealth v. Patterson*, 91 A.3d 55, 76 (Pa. 2014) (citations omitted).

In challenging the voluntariness of waiver, Appellant relies on *Commonwealth v. Gibbs*, 553 A.2d 409 (Pa. 1989) and *Commonwealth v. Morgan*, 606 A.2d 467 (Pa. Super. 1992). Reliance on *Gibbs* and *Morgan*, however, is misplaced. Unlike *Gibbs* and *Morgan*, here there is no inducement to relinquish any right. In *Gibbs*, the Supreme Court

> concluded that the defendant had been impermissibly induced to make a confession without consulting an attorney when in response to the defendant's question, "Maybe I should talk to a lawyer. What good would it do me to talk to you?" a police officer responded, "I really don't know what good it would do. The only thing is I would tell the District Attorney you cooperated for whatever good that would be, but I would have no idea whether it would help your case or not." [*Gibbs*, 553 A.2d at 409].

*Commonwealth v. Laatsch*, 661 A.2d 1365, 1366 (Pa. 1995).

In concluding that the officer impermissibly induced defendant not to pursue further his equivocal request for counsel, the Supreme Court noted:

> In the present case under review, we hold that the statement by the authorities to [Gibbs] was an impermissible inducement and thereby tainted his admissions. By conveying the distinct impression that the district attorney would be told of his cooperation in giving a confession on the spot, there occurred an inescapable inducement which cannot be condoned under our law. . . . Promises of benefits or special considerations, however benign in intent, comprise the sort of persuasion and trickery which easily can mislead suspects into giving confessions. The process of rendering *Miranda* warnings should proceed freely without any intruding frustration by the police. Only in that fashion can we trust the validity of subsequent admissions, for if the initial employment of *Miranda* is exploited illegally, succeeding inculpatory declarations are compromised.

> Misleading statements and promises by the police choke off the legal process at the very moment which **Miranda** was designed to protect.

**Gibbs**, 533 A.2d 410-11.

"**Gibbs** dealt with an offer of lenient treatment in return for the defendant's cooperation in the investigation of the crime with which he had been charged, *i.e.*, an incriminating statement implicating the defendant himself." **Laatsch**, 661 A.2d at 1367.

This is not the case here. The statement at issue here is: "Basically, what you need to do is answer [the detectives' questions], tell them the truth, and you should be okay." N.T. Suppression, 4/1/13, at 54. There is no offer, promise, or subterfuge of any sort to induce Appellant to waive his right against self-incrimination. "The promise here did not even concern a recommendation to talk to the [c]ourt or the prosecutor with respect to the overall prosecution, *contrast* **Gibbs,** nor was there a promise that a confession would result in no charges being filed." **Templin**, 795 A.2d at 967 (citing **Commonwealth v. Nester**, 709 A.2d 879, 883 (Pa. 1998)).[4]

Additionally, to the extent the statement uttered by Agent Miller could be construed as a promise of some sort, the statement could not have

---

[4] **See also Laatsch**, 661 A.2d at 1367 ("[T]here is a clear distinction between an offer conditioned on a confession, and an offer seeking cooperation in the investigation of others without the prerequisite of self-incrimination. The former is clearly an impermissible inducement to waive one's right against self-incrimination; the latter is not.").

"choke[d] off the legal process at the very moment which *Miranda* was designed to protect" because it was not made in the process of rendering the *Miranda* warnings. In fact, the context surrounding Agent Miller's statement is temporally and circumstantially distinct and separate from the context surrounding the waiver of his *Miranda* rights. To the extent timing of the alleged improper statement is relevant, we also note that Agent Miller's statement preceded, not followed, the administration of the *Miranda* warnings.[5] Finally, unlike *Gibbs*, Appellant here did not invoke, in any fashion, or at any time, his intention to exercise his *Miranda* rights. In light of the foregoing, we conclude the instant matter is distinguishable from *Gibbs*.

---

[5] *See Friedman*, 602 A.2d at 378. ("In *Gibbs*, the statement found to be an inducement was made to defendant after he was read his rights and after he asked a question, 'What good would it do me to tell you?' This sequence of events rendered the detective's response of possible benefits by telling the court of defendant's cooperation an inducement."); *Commonwealth v. Lester*, 572 A.2d 694, 697 (Pa. Super. 1990) ("We note that the *Gibbs* court restricted its decision to situations where improper offers by the police in exchange for cooperation by the defendant followed the administration of *Miranda* warnings."). *See also Templin*, *supra*, at 965 ("Obviously, an inducement to waive following upon an assertion of rights after being given *Miranda* warnings implicates more than a due process concern with voluntariness of confession; it may burden the defendant's constitutional privilege against compulsory self-incrimination or the right to counsel."); *Morgan*, *infra*.

*Morgan*, a Superior Court's decision that relied upon and extended *Gibbs*,[6] does not change our conclusions. In *Morgan*, this Court found that the interrogating officer, after advising the defendant of his *Miranda* rights and obtaining a confession from him regarding a theft, improperly induced defendant to waive his right to remain silent on other crimes by promising defendant to inform the district attorney of his cooperation. Defendant confessed to committing the other crimes, and this Court affirmed the trial court's order granting defendant's motion to suppress. In concluding that the promise was impermissible, we noted:

> It is the *inducement* which leads to overcoming resistance to police procedures with which *Gibbs* is concerned and not the specific right waived[.] . . . *Gibbs* speaks to the fact that police cannot deliver what they promise in the inducement and, therefore, waiver of a right based upon a false promise cannot be fairly accepted as a knowing and voluntary waiver.

*Morgan*, 606 A.2d at 469 (emphasis in original).

Unlike *Morgan*, here there is no specific offer or promise of any kind, let alone one of lenient treatment in return for Appellant's cooperation (*i.e.*, confession) in the investigation. Additionally, there is no evidence the statement was meant to overcome any resistance by Appellant to waive any

---

[6] *Morgan* extended the *Gibbs* rationale "to apply not only to situations in which a defendant is persuaded to forgo his right to counsel, but also to those cases in which the promise of favorable treatment by the district attorney is used to induce a defendant to waive his right against self-incrimination." *Laatsch*, 661 A.2d at 1367.

rights. Twice Appellant confessed his crimes despite the fact he was warned twice of his rights. As such, ***Morgan*** is inapposite.

Appellant next argues that the close relationship between Agent Miller and Appellant and the fact Agent Miller kept his past promises to secure two one-year extensions of his immigration status and paid him over $20,000 for his undercover work "in exchange for his cooperation[,]" poisoned Appellant's waiver of his right against self-incrimination. Appellant's Brief at 20. We disagree.

While the promises Agent Miller made and benefits Appellants received in the past were clear and definite, the same cannot be said about the instant statement made by Agent Miller. A promise that "you should be okay" if he answered the investigators' questions is not a promise of benefits or special considerations so as to mislead Appellant into waiving his right to self-incrimination. Agent Miller asked Appellant to work undercover for the Department of Homeland Security for the purpose of providing him with information about a criminal enterprise being investigated by the Department. In return, Agent Miller secured two extensions of his immigration status, and paid him $20,000. The promise here did not carry any tangible benefit and was not conditioned on relinquishing anything.

Appellant also emphasizes the relationship between Appellant and Agent Miller was one of trust. While there is evidence of frequent contacts between the two, there is no indication the contacts were anything more than a business relationship between them. N.T. Suppression, 4/1/13, at

33.    Appellant agreed to gather and relay information about a criminal organization, and Agent Miller paid Appellant or otherwise gave him benefits for his work as an informant: nothing more than a business relation relationship; nothing different from other arrangements investigators have with confidential informants.  ***Id.*** at 34.

Moreover, looking at the context in which the statement was made, the record shows that Agent Miller made the statement after Appellant confessed to the killings, while still in the process of taking basic biographical information from Appellant, despite the fact Agent Miller warned Appellant of his rights, and long before the detectives read his ***Miranda*** warnings.  At the time the detectives read his ***Miranda*** warnings, the detectives did not make promises of benefits or special considerations, did not misrepresent his rights, and asked specific questions about his understanding and waiver of those rights.  There is no indication Appellant did not understand his rights or that he placed any importance on Agent Miller's earlier statement.[7]  Specifically, the trial court found the following facts:

---

[7] To this end, the trial court noted:

> Appellant had plenty of opportunities to confirm Agent Miller's statements with Detective Bradbury during his interview, but he did not.  He also did not ask to have Agent Miller present during his interrogation, and in fact made no mention of Agent Miller throughout the entire time he spent with the Montgomery County Detectives.

*(Footnote Continued Next Page)*

[Appellant] was brought into custody around 11:00 a.m. and his actual interrogation by the Montgomery County [d]etectives began at 2:39 p.m. the same day. Prior to the interview, [Appellant] signed an acknowledgment that Detective Bradbury read his ***Miranda*** rights. He appeared to be in good health, not wanting for anything, had no visible injuries, and appeared to be a little cold but had been provided with a blanket. The question-answer concluded at 5:06 p.m. [Appellant] initialed his answers, signed the end of the document, and was asked if there was anything else that he wished to discuss. [Appellant] never once made any reference to his conversation with Agent Miller.

The videotape confession commenced at 6:04 p.m. and ended at 6:32 p.m. Thus, [Appellant] had been in custody for a little over seven hours. The court took this into consideration, however, [it] found that the duration was not overly long, and the nature of the interrogation does not indicate that [Appellant] was subjected to any duress, physical threats, or an environment in which his will was overborne by the detectives. Furthermore, the court found that [Appellant] appeared to be very calm, direct, and aware of what he was doing during his videotaped confession.

Additionally, the court considered Detective Brandbury's attitude from videotape and from the written questions he asked [Appellant]. They appeared to be just two people interacting in a respectful manner. There was nothing present to indicate that [Appellant] was drained of his ability to withstand suggestion and coercion.

Trial Court Opinion, 10/16/13, at 9-11 (footnote omitted).

_____
*(Footnote Continued)*
_____

Trial Court Opinion, 10/16/13, at 11. We also note that in the written portion of Appellant's confession, Appellant did not indicate that he had been promised anything in exchange for his confession. N.T. Suppression, 4/2/13, at 96.

- 12 -

We agree with the trial court's analysis and conclusions.[8]  Considering the totality of the circumstances surrounding the assertion of the waiver,[9] there is no indication the waiver was involuntary.  Accordingly, we discern no basis to reverse the trial court's determination that Appellant voluntarily waived his right against self-incrimination.

Judgment of sentence affirmed.

_____

[8] Appellant takes also issue with the trial court considering and believing the benign explanation provided by Agent Miller for the statement at issue here (*i.e.*, to calm the situation), arguing the trial court should have instead considered the impact of the statement on Appellant, citing **Williams**, **Levanduski**, and **DiStefano**.  We agree that promises of benefits or special considerations—which were not made here—"however benign in intent, comprise the sort of persuasion and trickery which easily can mislead suspects into giving confessions."  **Gibbs**, 553 A.2d at 411.  Under the totality of the circumstances, as recounted above, however, the statement did not rise to the level of impermissible inducement.  We also note the proposition for which Appellant cited the cases noted above is of no help under the circumstances because they pertain to the standard for determining whether a defendant is in custody at the time of making statements, which is not contested here.

[9] In determining whether a defendant's waiver of **Miranda** rights is voluntary, "the focus is upon police conduct and whether a knowing, intelligent, and voluntary waiver was effected based on a totality of the circumstances [.]"  **Commonwealth v. Sepulveda**, 55 A.3d 1108, 1137 (Pa. 2012).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/9/2014