654 A.2d 1109

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Vicki Jean FEWELL, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 15, 1994.

Filed Feb. 10, 1995.

542

544

Michelle H. Kelly, Erie, for appellant.

James K. Vogel, Asst. Dist. Atty., Erie, for Com., appellee.

Before ROWLEY, President Judge, and HUDOCK and CERCONE, JJ.

HUDOCK, Judge.

This is an appeal from the judgment of sentence imposed after Appellant was convicted in a jury trial of endangering the welfare of a child.[1] Timely filed post-trial motions were denied and Appellant was sentenced to a term of imprisonment for a minimum of ninety days and a maximum of twelve months. This timely appeal followed. We affirm.

The events which led to Appellant's conviction occurred on December 11, 1990, when her four-month-old son, Matthew Fewell, died by asphyxiation. When police originally questioned her, Appellant claimed that the night before his death, she accidentally left a plastic grocery bag in her son's crib while she was cleaning and changing the liners in the garbage cans. Appellant explained to police that after she placed her son in his crib for his afternoon nap, at approximately 12:30 p.m., she left his room to attend to her five-year-old daughter. When she returned to her son's room at approximately 2:00 p.m., she found him with the plastic bag over the top of his face. Appellant theorized that the infant found the plastic bag lying in his crib, placed it over his face, and suffocated himself. The police initially ruled the infant's death an accident and closed the investigation in 1991.

Following her son's death Appellant experienced severe depression and suicidal ideation which necessitated hospitalization in St. Vincent's mental health facility. On January 23, 1992, Appellant was involuntarily committed to the mental health facility pursuant to the Pennsylvania Mental Health Procedures Act, 50 P.S. § 7101 *et seq.* During counselling sessions in February of 1992, Appellant revealed to her psychiatrist, Dr. Lance Besner, that she intentionally placed the plastic bag over her son's head to stop his crying. Without obtaining Appellant's prior consent, Dr. Besner immediately contacted the Erie County Coroner's office and reported Appellant's inculpatory statements. Appellant waited outside of Dr. Besner's office when he contacted the coroner. The coroner reopened the investigation into the child's death and

1. 18 Pa.C.S. § 4304.

changed the manner of death noted on the infant's death certificate from "accident" to "homicide." On April 13, 1992, Trooper Dana Anderson of the Erie County Police visited Appellant at her house and requested her to explain the events which led to her son's death. Appellant agreed to accompany Trooper Anderson to police barracks where, after being read her *Miranda*[2] rights, she repeated her confession. Two days later Appellant was arrested and charged with criminal homicide, recklessly endangering another person, endangering the welfare of a child, and providing false reports to law enforcement authorities.[3] A jury trial was held from January 20 to 25, 1994, where Appellant was found guilty of endangering the welfare of a child. Appellant was acquitted of all other charges. This timely appeal followed in which Appellant presents three issues for our review:

[1.] Whether the trial court erred in denying [Appellant's] pre-trial motion for habeas corpus relief?

[2.] Whether the trial court erred in admitting [Appellant's] statement to the police at trial prior to the Commonwealth's proof of corpus delicti?

[3.] Whether the trial court erred in allowing Dr. [Besner] to testify to statements made by [Appellant] over [Appellant's] objection and in violation of the psychiatrist-patient privilege?

Appellant's Brief, at p. 1.

 Appellant addresses the first two issues together. She contends that the Commonwealth improperly introduced her confession at the preliminary hearing before it established the corpus delicti[4] of the crimes charged. Appellant claims

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. 18 Pa.C.S. §§ 2501, 2705, 4304, and 4906(b)(1) & (2), respectively.

4. "Corpus delicti means the body of the crime or the fact that a crime has been committed." *Commonwealth v. Meder*, 416 Pa.Super. 273, 277, 611 A.2d 213, 215 (1992), *alloc. den.* 533 Pa. 643, 622 A.2d 1375 (1993) (quoting *Commonwealth v. Brusky*, 219 Pa.Super. 54, 56, 280 A.2d 826, 827 (1971)). This evidentiary rule provides that the jury may not consider a defendant's own admissions or confessions of guilt until the Commonwealth has presented sufficient evidence to convince the

that the District Magistrate should not have held her over for trial at the preliminary hearing because the Commonwealth offered no proof that a crime occurred, absent her inculpatory statements. Therefore, she concludes that it was error for the trial court to deny her pre-trial request for habeas corpus relief.[5]

Appellant's allegation of error at the preliminary hearing is moot. In *Commonwealth v. Tyler*, 402 Pa.Super. 429, 587 A.2d 326 (1991), this Court held that "[o]nce appellant has gone to trial and been found guilty of the crime, any defect in the preliminary hearing is rendered immaterial[.]" *Id.* 587 A.2d at 328. In *Tyler*, the appellant appealed from a judgment of sentence entered after a jury convicted him of possession and delivery of a controlled substance. The appellant claimed that the Commonwealth established its prima facie case at the preliminary hearing by the hearsay testimony of a confidential police informant, thus violating his constitutional right to confront his accuser. This Court rejected the appellant's claim and held that "[s]ince the Commonwealth met its burden of proving appellant guilty beyond a reasonable doubt at trial, even if the Commonwealth had failed to establish a prima facie case at the preliminary hearing, it is immaterial." *Id.* (citations omitted). *See also Commonwealth v. Murray*, 348 Pa.Super. 439, 502 A.2d 624 (1985), *alloc. den.*, 514 Pa. 642, 523 A.2d 1131 (1987) (violation of appellant's sixth amendment right to a public preliminary hearing was not reversible error since error was cured at trial).

Appellant's argument that the district justice should not have held her over for trial at the preliminary hearing became moot once she was convicted by a jury at a fair and impartial

jury beyond a reasonable doubt that a crime has occurred. *Commonwealth v. Vosburg*, 393 Pa.Super. 416, 421–23, 574 A.2d 679, 682 (1990), *alloc. den.*, 529 Pa. 648, 602 A.2d 859 (1991).

5. Appellant's pre-trial petition for habeas corpus relief was denied on February 12, 1993. Appellant then filed an application for leave to file an interlocutory appeal to this Court, which was denied on June 9, 1993 without prejudice to file a petition for permission to appeal.

548

trial.[6] *See Commonwealth v. Owens,* 437 Pa.Super. 64, 649 A.2d 129 (1994).

■ Next, we address Appellant's claim that the trial court erred in allowing Dr. Besner to testify to statements she made while in his psychiatric care. Appellant claims that her incriminating statements were protected under both the psychiatrist-patient privilege and the Mental Health Procedures Act.

42 Pa.C.S. § 5944 sets forth the privilege between psychiatrists and patients. It states:

> No psychiatrist ... shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

42 Pa.C.S. § 5944.

The psychiatrist-patient privilege, which was modeled after the attorney-client privilege, codified a strong public policy that confidential communication made by a patient to his psychiatrist should be absolutely protected from disclosure. "Information which is protected by an absolute statutory privilege is not subject to disclosure...." *Commonwealth v. Eck,* 413 Pa.Super. 538, 544, 605 A.2d 1248, 1252 (1992). We have previously explained the rationale for this privilege:

> The privilege afforded by § 5944 was intended to inspire confidence in the client and to encourage full disclosure to the psychologist [and psychiatrist]. By preventing the latter from making public any information which would result in humiliation, embarrassment or disgrace to the client, the privilege is designed to promote effective treatment and to insulate the client's private thoughts from public disclosure.

6. In a one sentence argument, Appellant asserts that the Commonwealth committed the same error at trial by improperly introducing her admission prior to establishing the corpus delicti of the crimes charged. We will not consider the merits of a claim when it is not properly raised and developed in Appellant's brief. *See Commonwealth v. Sanford,* 299 Pa.Super. 64, 445 A.2d 149 (1982).

*Commonwealth v. Kyle*, 367 Pa.Super. 484, 500, 533 A.2d 120, 128 (1987), *alloc. den.*, 518 Pa. 617, 541 A.2d 744 (1988).

Recognizing that the psychiatrist-patient privilege serves to protect the privacy interests of the patient, it has been suggested in several Pennsylvania appellate decisions that the privilege is based on the patient's constitutional right of privacy. A plurality of the Supreme Court of Pennsylvania recognized that a patient's right of privacy, which is protected by both the federal and Pennsylvania Constitutions[7], prevents a doctor from disclosing information he obtained during the course of psychotherapy. *In Re B.*, 482 Pa. 471, 485–87, 394 A.2d 419, 426 (1978). In that case the trial court subpoenaed the psychiatric records of the mother of a delinquent child in order to determine his proper custody placement. The mother's psychiatrist refused to release the records without her consent and was held in criminal contempt. The psychiatrist argued that the records were privileged from judicial disclosure by the doctor-patient privilege[8] and the patient's constitutional right of privacy. Justice Manderino wrote the plurality opinion and held:

"... an individual's interest in preventing the disclosure of information revealed in the context of a psychotherapist-patient relationship has deeper roots than the Pennsylvania doctor-patient privilege statute, and that the patient's right to prevent disclosure of such information is constitutionally based. This constitutional foundation emanates from the penumbras of the various guarantees of the Bill of Rights, *Griswold v. Connecticut,* [381 U.S. 479, 85 S.Ct. 1678, 14

7. The right of privacy is not specifically guaranteed in the United States or Pennsylvania Constitutions. However, the Supreme Court of the United States has held that zones of privacy are created by the more specific constitutional guarantees found in the Bill of Rights. The Pennsylvania Supreme Court has also held that the protection provided by Article I, Section 8 of the Pennsylvania Constitution extends to "those zones where one has a reasonable expectation of privacy." *Commonwealth v. DeJohn*, 486 Pa. 32, 44, 403 A.2d 1283, 1289 (1979), *cert. den.*, 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980).

8. When this case was decided, the doctor-patient privilege was found at 28 P.S. § 328. Currently the doctor-patient privilege is found at 42 Pa.C.S. § 5929.

L.Ed.2d 510 (1965) ], as well as from the guarantees of the Constitution of this Commonwealth...."

*Id.* 482 Pa. 483, 394 A.2d at 425. Only one Justice joined in Justice Manderino's opinion that the psychiatrist-patient privilege is based on the constitutional right of privacy, while two justices concurred in the result without filing an opinion. Justice Roberts concurred in the result but held that no constitutional question was presented. Former Chief Justice Eagen dissented but recognized that in certain cases the right of privacy may prevail over the need to disclose a patient's medical records. Justice Pomeroy, joined by Justice Nix, dissented because they believed that it was unnecessary to address the constitutional argument. Since Justice Manderino did not gather majority support for his opinion that the privilege is constitutionally protected, we must treat his opinion as non-precedential. *See Miller v. Colonial Refrigerated Transportation, Inc.,* 81 F.R.D. 741 (1979), for a discussion of the precedential value of *In re B., supra* 482 Pa. at 471, 394 A.2d 419.

More recently several members of our Supreme Court recognized that the statutory physician-patient privilege is rooted in the United States and Pennsylvania Constitutions in *In Re The June 1979 Allegheny County Investigating Grand Jury,* 490 Pa. 143, 415 A.2d 73 (1980). Then Chief Justice Eagen, writing for three members of the Court, held:

Clearly, the privacy interest of the patients which is implicated under the instant set of facts is the interest in avoiding disclosure of personal matters. This privacy interest finds explicit protection in the Pennsylvania Constitution, Art. 1, § 1, which provides, in pertinent part: "All men ... have certain inherent and indefeasible rights, among which are those ... of acquiring, possessing, and protecting property and reputation ...." Disclosure of confidences made by a patient to a physician, or even of medical data concerning the individual patient could, under certain circumstances, pose such a serious threat to a patient's right not to have personal matters revealed that it would be impermissible under either the United States Constitution or the Pennsylvania Constitution.

*Id.* 415 A.2d at 77–78 (Eagen, C.J., joined by O'Brien and Kauffman, JJ.). Both dissenting justices agreed that the privacy interest in preventing disclosure of medical records finds explicit protection in the United States and Pennsylvania Constitutions. *See also Commonwealth ex rel. Gorto v. Gorto,* 298 Pa.Super. 509, 513, 444 A.2d 1299, 1301 (1982) (in accord with *In re B., supra,* 482 Pa. at 471, 394 A.2d 419, access to patient's psychiatric records violated her constitutional right to privacy).

The Commonwealth and trial court concede that Appellant's communications with Dr. Besner, where she admitted that she intentionally suffocated her son, were protected by the psychiatrist-patient privilege. However, they contend that Appellant waived this privilege by subsequently revealing the same information to Trooper Anderson. The Commonwealth relies on *Commonwealth v. Hancharik,* 534 Pa. 435, 633 A.2d 1074 (1993), to support this proposition.

We disagree that our Supreme Court's holding in *Hancharik* dictates that we find that Appellant waived her privilege. In *Hancharik,* the appellant was convicted of involuntary deviate sexual intercourse, indecent assault, and corruption of a minor. On appeal the appellant claimed that his trial counsel was ineffective for failing to object to testimony of his wife which revealed that he had previously expressed his desire to adopt an older girl whose age was similar to the age of his victim. The appellant argued that his communications were confidential and thus protected under the statutory privilege for confidential communication between spouses, 42 Pa.C.S. § 5914. That statute provides:

[I]n a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon the trial.

42 Pa.C.S. § 5914.

Our Supreme Court held that appellant waived the statutory privilege of 42 Pa.C.S. § 5914 by telling many people, other than his wife, that he wished to adopt an older girl. Because the appellant did not make the statement to his wife in

confidence, it was not protected under the terms of the statutory privilege.

Unlike the statements made in *Hancharik,* Appellant's statement to Dr. Besner was made in confidence while she sought his professional psychiatric help. Appellant relied on the confidential relationship with Dr. Besner when she revealed that she intentionally placed the plastic bag over her son's head. We have previously explained in reference to the attorney-client and marital privileges that, "it is 'the relationship that existed at the moment of the communication which society seeks to protect by the privilege, not the substance of the message itself.'" *Commonwealth v. Ferri,* 410 Pa.Super. 67, 73, 599 A.2d 208, 211 (1991), *alloc. den.,* 534 Pa. 652, 627 A.2d 730 (1993), *cert. den.,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 540 (1993) (quoting *Commonwealth v. Clark,* 347 Pa.Super. 128, 133, 500 A.2d 440, 443 (1985)).

Although dealing with the privilege protecting confidential communications between spouses, the analysis in *Commonwealth v. Clark, supra,* is applicable to the facts of this appeal. In *Clark,* the appellant, who was convicted of second degree murder, argued that his former wife should not have been permitted to testify on behalf of the Commonwealth on the grounds that her testimony violated the privilege protecting confidential communication between spouses. The wife testified that the appellant confessed to her that he shot and killed a gas station attendant. The trial court held that the wife's testimony was admissible since the appellant had waived any privilege against disclosure by subsequently relaying the same information to a third party. The issue presented on appeal was "whether [the privilege protecting confidential spousal communications] may be waived by a spouse by subsequently relating the substance of the confidential communication to third parties." *Id.* 130, 500 A.2d at 441. We stated:

[W]e must decide whether the nature of the communications changes once the speaker spouse reveals their substance to third parties. Clearly, the substance of the latter communications cannot be considered confidential just because it was once that. Third parties were free to testify against appel-

lant. But, keeping the purpose of the privilege uppermost, we are not convinced that the confidentiality that inhered in the initial conversation can be wiped away when the speaker for whatever reason, talks to the third parties about the same matters.

*Id.* 132, 500 A.2d at 442. We concluded that the trial court erred in allowing appellant's former wife to testify and reveal confidential communications with the appellant.

In *Commonwealth v. Ferri, supra,* 410 Pa.Super. at 67, 599 A.2d 208, this Court adopted the rationale of *Clark* in reference to the attorney-client privilege. The issue presented was whether the appellant waived his attorney-client privilege by disclosing confidential matters to a third party. We stated:

> The attorney-client privilege, likewise, seeks to protect a relationship by fostering "a confidence between client and advocate that will lead to a trusting and open attorney-client dialogue." *Estate of Kofsky,* 487 Pa. 473, 482, 409 A.2d 1358, 1362 (1979). The result of a violation of the attorney-client privilege is "damage to the administration of justice." *Id.* Analogous to the marital privilege, it is the relationship between the attorney and client at the moment of the communication that society seeks to protect. Thus, the holding in *Clark* is equally applicable to prevent waiver of the attorney-client privilege.

*Ferri,* 410 Pa.Super. 72–73, 599 A.2d at 211–12.

Like the appellants in *Clark* and *Ferri,* Appellant may prevent Dr. Besner from revealing her confidential communication. Without her prior consent Dr. Besner could not take the stand and reveal what Appellant disclosed to him in confidence. We must preserve the confidential relationship between Appellant and her psychiatrist in order to promote the essential purpose of the statutory privilege—to encourage and foster full disclosure during psychiatric treatment.

The fact that Appellant later revealed to Trooper Anderson the same information she told Dr. Besner does not imply that she waived her statutory right to prevent Dr. Besner from revealing her confidential communications. Therefore, we

hold that the trial court erred by allowing Dr. Besner to testify on behalf of the Commonwealth and disclose the confidential information he obtained during the course of Appellant's psychiatric treatment.

The Commonwealth contends that any error in the admission of Dr. Besner's testimony was harmless. We agree.

The doctrine of "harmless error" is a technique of appellate review designed to advance judicial economy by obviating the necessity for retrial where the appellate court is convinced that the trial error was harmless beyond a reasonable doubt. *Commonwealth v. Wood,* 432 Pa.Super. 183, 214–16, 637 A.2d 1335, 1351 (1994). The harmless error rule derives from the notion that although an accused is entitled to a fair trial, he is not entitled to a perfect one. *Id.* An error in the admission or exclusion of evidence requires reversal unless the Commonwealth establishes that the error was harmless beyond a reasonable doubt. *Commonwealth v. Story,* 476 Pa. 391, 406, 383 A.2d 155, 162 (1978). Our Supreme Court previously explained:

> Error is considered to be harmless where: 1) the error did not prejudice the defendant or the prejudice was de minimus; or 2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or 3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Williams,* 524 Pa. 404, 409, 573 A.2d 536, 538–39 (1990) (citing *Commonwealth v. Story,* 383 A.2d at 164–166).

The Commonwealth argues that Dr. Besner's testimony was merely cumulative of Trooper Anderson's "untainted" testimony and thus harmless. It relies on the proposition that, "[a]n error which, viewed by itself, is not minimal, may nonetheless be harmless if properly admitted evidence is substantially

similar to the erroneously admitted evidence." *Story,* 383 A.2d at 165 (footnote omitted).

The issue we must address is whether Trooper Anderson's testimony was "untainted" and properly admitted. This case presents unique circumstances in that Appellant confessed to Trooper Anderson that she placed the plastic bag over her son's head only after she knew that Dr. Besner had breached her confidence. Prior to Dr. Besner's telephone call to the coroner, the investigation into Matthew Fewell's death was closed. Trooper Anderson never would have questioned Appellant regarding the death of her son if Dr. Besner hadn't notified the coroner that Appellant implicated herself in a confidential counselling session in February of 1992. The violation of Appellant's confidence by Dr. Besner led the police to reopen the investigation into her son's death, culminating with her confession to Trooper Anderson. Despite this unique chain of events, we find that Trooper Anderson's testimony was properly admitted and "untainted."

Initially we note that Appellant may not exclude her confession to Trooper Anderson on the basis of the exclusionary rule and "fruit of the poisonous tree" doctrine. The Supreme Court of the United States explained this evidentiary rule in *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), as follows:

> The exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ...." Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure. *Weeks v. United States,* 232 U.S. 383, 34 SCt 341, 58 LEd 652 (1914); *Mapp v. Ohio,* 367 U.S. 643, 81 SCt 1684, 6 LEd2d 1081 (1961). This prohibition applies as well to the fruits of the illegally seized evidence. *Wong Sun v. United States,* 371 U.S. 471, 83 SCt 407, 9

LEd2d 441 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 SCt 182, 64 LEd 319 (1920). *Id.* at 347, 94 S.Ct. at 619.

█ The exclusionary rule was judicially created "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures...." *Id.* Since deterrence of police misconduct is the primary goal of the exclusionary rule, this evidentiary rule does not apply to evidence obtained by private citizens which is subsequently turned over to government authorities. *Commonwealth v. Eshelman*, 477 Pa. 93, 96–98, 383 A.2d 838, 840 (1978).

In the present case, Appellant does not allege, nor can she allege, that she was subject to any police or government misconduct. The illegal conduct which Appellant alleges—the violation of her psychiatrist-patient privilege—does not constitute an "unreasonable search or seizure" which the courts hope to deter by applying the exclusionary rule. By disclosing Appellant's confidential communication, Dr. Besner violated a statutory privilege—he was not a state actor conducting an illegal search or seizure. Therefore, the exclusionary rule does not apply to the facts of this case.

█ Next we must examine whether there are alternative grounds to exclude Appellant's confession to Trooper Anderson. During direct-examination Trooper Anderson explained the events which transpired on April 13, 1992 when he arrived at Appellant's home. He explained:

I drove to her house by myself and identified myself and was asked inside, sat down at the kitchen table with [Appellant] and her husband and advised her that I would like to speak to her about her son Matthew and that—about the next thing I did was advise her of her constitutional rights.

N.T., 1/24/94, at p. 41. Trooper Anderson then read Appellant her *Miranda* rights and asked her to sign a waiver form that acknowledged that Appellant fully understood her rights to remain silent and to the presence of an attorney. Appellant executed the waiver form and began answering Trooper

Anderson's questions. Initially Appellant explained that she could not remember what happened to her son. Later, Appellant stated that "she [confessed to Dr. Besner] to punish herself because she felt guilty about his death and wanted to be punished for it." N.T., 1/24/94, at p. 44. Trooper Anderson then asked Appellant if she would accompany him to the state police barracks so that they could continue their conversation in private. Appellant agreed and Trooper Anderson drove Appellant to the police barracks. At the police station, Trooper Anderson continued to question Appellant, which eventually led to her confession. Trooper Anderson requested permission to tape record their conversation and Appellant agreed. During the course of the tape-recorded interview, Appellant stated:

[Matthew] wouldn't calm down, so I took the bag, put it in his bed and he still wouldn't calm down. And there was a bag layin' there which I put over his head and left the room. And then, then I didn't know—it was like I wasn't there when I did it and I, I didn't know whether it happened, so I went back and he was apparently dead.

N.T., 1/24/94, at p. 53.

The record reveals that Appellant validly waived her *Miranda* rights and voluntarily complied with Trooper Anderson's request to explain the circumstances leading to her son's death. Appellant then voluntarily confessed to suffocating her son. Her confession to Trooper Anderson was not a result of coercion or duress and was not protected by any statutory privilege. Therefore, we hold that Appellant's confession to Trooper Anderson was properly introduced at trial. Accordingly, we agree with the Commonwealth that allowing Dr. Besner to testify was harmless error as his testimony was merely cumulative of other "untainted" testimony.

■ In addition, we find that there is an alternative ground to hold that the admission of Dr. Besner's testimony was harmless error. Appellant suffered no prejudice from the admission of Dr. Besner's testimony since she was acquitted of the homicide and reckless endangerment charges and there

was sufficient evidence to sustain Appellant's conviction of child endangerment aside from the testimony of Dr. Besner and Trooper Anderson.

18 Pa.C.S. § 4304 defines the crime of endangering the welfare of a child. It provides:

A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits a misdemeanor of the first degree if he **knowingly** endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S. § 4304. (emphasis added).

■ Endangering the welfare of a child is a specific intent offense which was enacted in broad terms to safeguard the welfare and security of children. *Commonwealth v. Taylor*, 324 Pa.Super. 420, 424–26, 471 A.2d 1228, 1230 (1984). To convict an accused of this statute, the Commonwealth must prove a "knowing violation of a duty of care." *Commonwealth v. Cardwell*, 357 Pa.Super. 38, 43, 515 A.2d 311, 313 (1986), *alloc. den.*, 515 Pa. 573, 527 A.2d 535 (1987). "Knowingly" is defined in section 302(b)(2) of the Crimes Code as follows:

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S. § 302(b)(2).

The Pennsylvania Crimes Code does not specifically define or describe the duty of care referred to in section 4304, however, this Court has frequently addressed that precise issue. "A parent is charged with the duty of care and control, subsistence and education necessary for the child's physical, mental and emotional health and morals." *Commonwealth v. Barnhart*, 345 Pa.Super. 10, 18, 497 A.2d 616, 620–21 (1985),

*alloc. den.,* 517 Pa. 620, 538 A.2d 874 (1988), *cert. den.,* 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 34 (1989).

In *Commonwealth v. Cardwell, supra,* 357 Pa.Super. 38, 515 A.2d 311, this Court elaborated on the intent element needed to sustain a conviction of endangering the welfare of children. We stated:

> We hold that evidence is sufficient to prove the intent element of the offense of endangering the welfare of a child, 18 Pa.C.S.A. § 4304, when the accused is aware of his or her duty to protect the child; is aware that the child is in circumstances that threaten the child's physical or psychological welfare; and has either failed to act or has taken actions so lame or meager that such actions cannot reasonably be expected to be effective to protect the child's physical or psychological welfare.

*Cardwell,* 357 Pa.Super. 46, 515 A.2d at 315. If the Commonwealth fails to prove any one of these elements, there is insufficient evidence to sustain a conviction for child endangerment. *Commonwealth v. Miller,* 411 Pa.Super. 33, 36–38, 600 A.2d 988, 990 (1992).

In another recent decision this Court addressed the degree of culpability required to prove endangering the welfare of children. *See Commonwealth v. Miller, supra.* In that appeal, the appellant was convicted of endangering the welfare of a child when her infant son died from smoke inhalation and burns after a fire broke out in the apartment where he lay sleeping. The appellant mistakenly left the baby alone in the apartment with a space heater on next to the bed where the baby was sleeping. The appellant believed the child's father when he told her that the neighbor downstairs agreed to watch their child as they went out to various nightclubs. This Court held that the appellant did not "knowingly" leave her child unattended and therefore, could not be guilty of "knowingly" endangering the welfare of children. We stated:

> Utilizing a common sense of the community approach to interpret the specific intent element of the statute, we find an implicit recognition that parents at times can make mistakes in judgment and that their children may be

harmed as a result. However, for such mistakes to rise to the level of criminal culpability, parents must knowingly allow their children to be at risk with awareness of the potential consequences of their actions or of their failure to act.

*Id.* 411 Pa.Super. 41, 600 A.2d at 992.

After reviewing the record, we find that the Commonwealth presented sufficient evidence, independent of Dr. Besner's and Trooper Anderson's testimony, which supports Appellant's conviction of endangering the welfare of a child.

The Commonwealth offered the testimony of Trooper Thomas A. May, who conducted the initial investigation of Matthew Fewell's death. Trooper May testified as follows on direct examination:

[District Attorney]: Okay. Could you describe for us now what the nature was of the version that [Appellant] described to you?

[Trooper May]: Basically she claimed that she had laid her son Matthew on the crib and was in the process of changing a plastic bag which she used for putting soiled diapers in. She claimed that she placed a clean plastic bag, put it in the crib and became distracted at that point and went back out into the living room. She was then doing Christmas decorations with her daughter and was also running laundry. She claimed that she went back about an hour and a half later and discovered that the infant had become entangled in the plastic bag.

N.T., 1/24/94, at p. 15.

Appellant testified on her own behalf and explained the chronology of events differently than Trooper May. In her direct testimony Appellant claimed that the night before her son died she was replacing the garbage can liners with clean plastic garbage bags. The following exchange transpired during direct examination:

[Appellant's counsel]: Do you have a specific recollection on the Monday preceeding [sic] Matthew's death of putting a plastic bag or leaving one in his crib area?

[Appellant]: Yes, I had one left over and I did lay it on top of his blankets.

N.T., 1/25/94, at p. 97.

Although Trooper May and Appellant's testimony is conflicting as to when Appellant left the plastic bag in the crib, either version would support the jury's determination that she "knowingly" endangered the welfare of her son. Appellant acknowledged that she knew she left a plastic garbage bag in her infant son's crib while he was napping and then left her son unattended. Knowing that a plastic bag was within her son's reach, Appellant placed the infant in circumstances that threatened his physical welfare. Appellant knowingly placed her son at risk of suffocating himself with the plastic garbage bag. Therefore, there is sufficient evidence, independent of Dr. Besner's and Trooper Anderson's testimony, to convict Appellant of the child endangerment charge. We therefore reiterate our conclusion that the admission of Dr. Besner's testimony was harmless error.

Appellant also claims that her confidential communication with Dr. Besner was protected under the Mental Health Procedures Act (MHPA), 50 P.S. § 7101 et seq. Section 7111 of the Act provides in pertinent part:

## § 7111. Confidentiality of records

All documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone except:

(1) those engaged in providing treatment for the person;

(2) the county administrator, pursuant to section [7110];

(3) a court in the course of legal proceedings authorized by this act; and

(4) pursuant to Federal rules, statutes and regulations governing disclosure of patient information where treatment is undertaken in a Federal agency.

In no event, however, shall privileged communications, whether written or oral, be disclosed to anyone without such written consent.

50 P.S. § 7111.

The Mental Health Procedures Act is to be strictly construed. *Commonwealth v. Moyer*, 407 Pa.Super. 336, 595 A.2d 1177 (1991), *alloc. den.*, 529 Pa. 656, 604 A.2d 248 (1992). "A strict construction of Section 7111 reveals that all documents concerning persons in treatment are to be kept confidential and may not be released or disclosed to anyone, absent the patient's written consent, with certain exceptions." *Id.* 595 A.2d at 1179. These narrow exceptions are specifically delineated in the statute. The third exception, found in section 7111(3) of the statute, allows a court to review the patient's records in the course of legal proceedings authorized by the MHPA. However, the records "may be used by a court *only* when the legal proceedings being conducted are *within the framework* of the MHPA, that is, involuntary and voluntary mental health commitment proceedings." *Id.* (emphasis in original).

Appellant was involuntarily committed to St. Vincent's mental health facility in January of 1992 pursuant to the provisions of the MHPA. Any records that Dr. Besner kept concerning Appellant's treatment subsequent to this date were confidential and should not have been disclosed absent Appellant's prior consent. In the present case, Dr. Besner did not rely on Appellant's confidential records when testifying. He merely relayed what Appellant had confessed to him from his memory. Therefore, Appellant's claim that Dr. Besner violated her statutory privilege is without merit. Furthermore, as we stated earlier, any error in allowing Dr. Besner to testify was harmless error since his testimony was merely cumulative of Trooper Anderson's properly admitted evidence.

Judgment of sentence affirmed.