683 A.2d 659

**COMMONWEALTH of Pennsylvania**

v.

**Samuel Lee GREEN, Appellant.**

Superior Court of Pennsylvania.

Argued May 23, 1996.

Filed Aug. 29, 1996.

Karl F. Longenbach, Bethlehem, for appellant.

Mark Refowich, Assistant District Attorney, Easton, for appellee.

Before BECK, KELLY and BROSKY, JJ.

BECK, Judge:

In this appeal we address whether the circumstances of appellant's custodial interrogation violated *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where appellant was not specifically informed of the crime about which he was questioned. We find appellant's rights under *Miranda* were not violated and therefore we affirm.

Appellant was found guilty of first degree murder and sentenced to death. On direct appeal to the Pennsylvania Supreme Court, his judgment of sentence was reversed and a new trial was granted.[1] At the second trial, appellant was again found guilty of first degree murder and, this time, sentenced to life in prison. This appeal followed.

The evidence at trial, when viewed in a light most favorable to the Commonwealth as verdict winner, revealed the following. Sometime in the late night or early morning hours of October 22 and 23, 1987, appellant broke into the apartment of

---

1. The court found that the Commonwealth violated the mandate of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to turn over certain witness statements in its possession.

Harrisburg police officer Richard Bowser. A window screen and telephone cord recovered at the scene had appellant's fingerprints on them. Several items were taken from the residence, including the keys to Officer Bowser's car. The officer, who was naked, was removed from his apartment, placed in the trunk of his automobile, driven to a remote area of Northampton County, shot twice in the head and left beneath a pile of leaves and branches by the side of the road. At some point during this criminal episode, appellant was joined by a young woman named Bonnie Sue Pflugler. Pflugler accompanied appellant when he fled southward in Officer Bowser's vehicle.

Appellant and his companion abandoned the victim's car in Richmond, Virginia and took a bus to North Carolina.[2] Once there, they stole a van and some credit cards and made their way to Florida. At a rest stop outside Tallahassee, they were arrested by police who discovered them inside the stolen vehicle. Pflugler was released from custody after she and appellant told police that she was a hitchhiker he had picked up outside Miami. Appellant was taken to Leon County prison.

Meanwhile, Officer Bowser was reported missing in Pennsylvania after he failed to appear for work. A subsequent search of his apartment caused police to suspect he had been the victim of a serious crime.[3] A missing persons report alerted law enforcement officials nationwide of Bowser's disappearance, including Leon County Sheriff's Detective Sam Bruce, who interviewed appellant while he was awaiting extradition from Florida.

Detective Bruce met with appellant in the Leon County prison, gave appellant his *Miranda* rights and observed as appellant executed a written waiver of his rights. Prior to

2. Both appellant's and Pflugler's fingerprints were found in the victim's vehicle.

3. The apartment showed signs of a break-in and was in general disarray. In addition, the telephone was pulled from the wall, a knife was discovered in the bedroom, and Officer Bowser's glasses, which he usually wore, were found on the premises.

execution of the waiver, Detective Bruce did not inform appellant that he intended to ask him questions about Officer Bowser. Appellant claims he thought the questioning would be limited to the car theft. When Bruce asked appellant if he knew the officer, appellant replied that he "never heard of him." In response to questioning about the fact that appellant and Officer Bowser were from the same town in Pennsylvania and that appellant had left the area at about the same time Bowser was reported missing, appellant stated that he "smoked marijuana and stole, but never hurt anyone or murdered anyone." At the time of the interview, police did not know that the victim had been murdered.

Within a few days of Bruce's interview with appellant, FBI Agent Matthew Pelligrino visited appellant in the Leon County jail for the purpose of conducting an interview with appellant and taking his fingerprints. Appellant agreed to speak with Agent Pelligrino and again signed a written waiver form. In response to the agent's questions regarding appellant's activities in the previous two weeks, appellant gave varying stories regarding his travels. When confronted with the many inconsistencies in his different accounts, appellant changed his version of events several times. He specifically denied any knowledge of Officer Bowser's disappearance, but stated that if he had been involved in the matter, he would "have his mouthpiece right here doing the talking."

Appellant's next visitors in the Florida jail were Corporal Thomas Brennan of the Pennsylvania Sate Police and Special Agent Pat Kelly of the Harrisburg FBI. Again appellant signed a written waiver form relinquishing his right to remain silent or be provided with legal representation. During the interview, appellant gave several different accounts of his activities in Pennsylvania and Florida that directly contradicted his earlier statements. He named additional participants in the theft of the van in North Carolina and said he knew of two men in Harrisburg whose job it was to "get rid of bodies." Appellant also said he could make a telephone call and find out the location of Officer Bowser's body.

One week later, appellant was transported from Florida to Pennsylvania by Corporal Brennan, Trooper Jack Holtz and Dauphin County District Attorney Detective Gregg Benedek. The three men traveled with appellant by car. During the trip north, several statements were elicited from appellant, each of which was prefaced by a waiver of rights. Each statement differed from the others and in each appellant implicated himself slightly more than he had previously. Ultimately, appellant conceded his presence with Pflugler, who he claimed committed the various crimes. He also eventually admitted that he assisted Pflugler in covering the officer's body on the roadside, but consistently denied involvement in the kidnapping and murder of the victim.

Once back in Pennsylvania, appellant led Brennan and Holtz to Officer Bowser's body. Later, while incarcerated and awaiting trial, appellant twice contacted the troopers and gave them additional statements. Each time, appellant varied the facts of his "confession" but never admitted to shooting the victim.[4]

At the suppression hearing, all of the law enforcement officials who took statements from appellant testified to the circumstances surrounding the admissions.[5] Each officer testified to the waivers he obtained from appellant prior to taking the statements and each stated that appellant never asked for an attorney nor requested that the questioning cease.

Appellant, on the other hand, testified that he made numerous requests for a lawyer, that he was under the impression that the waivers were "standard police procedure," that he signed the waivers in order to get legal assistance and that the

[4]. Appellant also signed written waivers of his rights prior to making these statements. Both waivers included an explicit notation in which appellant conceded that he was represented by counsel and had been advised to remain silent but nonetheless contacted and wished to speak to authorities.

[5]. The suppression evidence was heard at two separate hearings. One hearing, at which Brennan, Holtz and appellant testified, occurred prior to trial. The other hearing, at which Florida Detective Bruce and FBI Agent Pelligrino testified, took place mid-trial. Appellant declined to testify at the mid-trial hearing.

substance of the statements was false and created by the law enforcement officials. In addition, appellant claimed that during one of the Florida interviews, FBI Agent Kelley used profane language and threatened him. He further testified that he contacted authorities only once after leading them to the victim's body and that the purpose of his call was to request that his family be left alone.

On appeal, appellant frames the suppression issue as follows:

Did the suppression Judge commit harmful and prejudicial error in finding that defendant-appellant, who was detained on an auto theft charge in Florida, made a knowing, voluntary and intelligent waiver of his constitutional right to remain silent prior to his interrogation in seven instances; when in the initial instance, a waiver of his Miranda rights was secured without first advising the defendant of the general nature of the investigation, namely the kidnapping and potential homicide of a missing police officer?

Appellant's primary argument concerns his interview with Detective Bruce in Florida. Appellant, who executed a written waiver of his rights prior to speaking with Detective Bruce, argues that because Bruce failed to inform him that he would be asked about Officer Bowser, his waiver was not knowing and intelligent. Specifically, appellant claims that the statements he gave in response to questions regarding Officer Bowser's disappearance should not have been admitted at trial because he was unaware he would be subjected to such questioning when he waived his *Miranda* rights.

Further, appellant argues, his subsequent statements to other law enforcement officials, which included his admissions to being present at the burglary, kidnapping and murder, were tainted as a "product of exploitation of the original illegality" and should have been excluded.[6] Appellant's brief at 17.

---

**6.** Appellant makes other claims in his brief, most having to do with the voluntariness of his initial waiver. He asserts that the fact that Detective Bruce is white and from the South, as opposed to appellant, who is black and from the North, contributed to the invalidity of the waiver.

Appellant relies primarily on our supreme court's decision in *Commonwealth v. Dixon*, 475 Pa. 17, 379 A.2d 553 (1977). There, Linda Dixon, the mother of a two-year-old boy, had been convicted of malicious mischief. Her sentence required her to make restitution payments to the injured party in the amount of $50.00 each month. She was told that in the event she defaulted on the payments, a warrant would issue for her arrest and police would be dispatched to take her into custody. Dixon defaulted and an arrest warrant was issued for her. Two days before the warrant issued, police found the decomposed body of Dixon's son in a wooded area and, ultimately, began to suspect Dixon in the child's death. Less than three weeks later detectives, armed with the arrest warrant for the restitution violation, arrived at Dixon's residence and asked her to accompany them to police headquarters. Dixon complied and when asked if she knew why the officers wanted to question her she replied "yes." After being given her *Miranda* warnings, Dixon waived her rights and agreed to speak with police. When shown a picture of her son and asked of his whereabouts, she promptly confessed that she "had done it." She was convicted of second degree murder.

On appeal, Dixon argued that her waiver had not been knowing and intelligent and that her confession should have been suppressed. Our supreme court held that a "valid waiver of *Miranda* rights requires that the suspect have an awareness of the general nature of the transaction giving rise to the investigation." *Dixon, supra* at 22, 379 A.2d at 556. The court stated that where a defendant has not been told of the crime under investigation prior to his or her waiver of rights under *Miranda,* and then makes a pre-trial challenge concerning the validity of his or her confession, the Commonwealth has the burden of proving by a preponderance of the

We find little testimony or argument on these issues in the record and even less support for the claims in appellant's brief. We also note that credibility determinations made by the suppression court cannot be reevaluated on appeal. The suppression judge, who heard the testimony of the officers and appellant, was in the best position to decide whose testimony was to be believed.

evidence that the defendant knew of the occasion for the interrogation. *Id.*

That burden can be satisfied in a number of ways, including "the establishment of circumstances attending the interrogation, such as the prior statements of the suspect ... or the fact that interrogation follows hard upon the criminal episode and there is no circumstance lending ambiguity to the direction and purpose of the questioning." *Id.* (citation omitted).

The *Dixon* court found that the circumstances of appellant's malicious mischief conviction created a palpable ambiguity that the Commonwealth did not overcome at the suppression hearing. As a result, Dixon's judgment of sentence was reversed and a new trial was granted.

While the rule of law set forth in *Dixon* is aptly illustrated by its compelling facts, subsequent treatment of the rule reveals that the standard to be applied in these cases is a narrow one. In *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288 (1983), the appellant relied on *Dixon* and argued that because his pre-interrogation warning form recited only charges of firearms violations and resisting arrest, his waiver with respect to questions he was asked about several homicides was not knowing and intelligent.

The *Travaglia* court rejected appellant's claim. It noted that the homicides the appellant was questioned about had occurred over the five days immediately preceding the interrogation. Quoting the language of *Dixon,* it found that the interrogation followed hard upon the criminal episode and no ambiguity as to the direction or purpose of the questioning was present. The court viewed the "entire episode in context" and found that the appellant was aware of the general nature of the transaction giving rise to his questioning. *Id.* at 486–488, 467 A.2d at 294.

A similar claim was made in *Commonwealth v. Moss,* 518 Pa. 337, 543 A.2d 514 (1988). Although the *Moss* court found that the appellant was informed of all the crimes about which he would be questioned, it noted the limited scope of *Dixon:*

188

It would appear, however, that the approach suggested [by appellant] would greatly expand the rule of ... *Dixon*.... We did not hold in *Dixon*, and we have never held, that a suspect must be informed of each and every crime under investigation. On the contrary, we have consistently held that the Commonwealth, in meeting its burden of proving a waiver was knowing and intelligent, may establish the circumstances attending the interrogation and the lack of ambiguity as to the questioning's direction and purpose.

*Moss, supra,* at 347, 543 A.2d at 519.

In 1990, a panel of this court rejected a claim based on *Dixon*. In *Commonwealth v. Carr,* 398 Pa.Super. 306, 580 A.2d 1362 (1990), *appeal denied,* 527 Pa. 621, 592 A.2d 42 (1991), an assailant shot at two women who were camping on the Appalachian Trail, killing one of them. The investigation focused on the appellant, who ultimately was picked up by police on an out-of-state fugitive warrant. After waiving his rights, the appellant made statements to police that were later used against him in his trial for first degree murder. On appeal, the appellant claimed that his waiver was not knowing and intelligent because he was not aware he would be questioned about the shootings. The *Carr* court found that the circumstances established that the appellant knew he was a suspect in the shootings and, therefore, he could not claim he was unaware of the general nature of the transaction about which he would be questioned.

Similarly, in *Commonwealth v. Friedman,* 411 Pa.Super. 628, 602 A.2d 371, *appeal denied,* 532 Pa. 650, 615 A.2d 340 (1992), a panel of this court found that the appellant was not entitled to suppression despite the fact that police refused to tell her whether the man she shot had died from his injuries.

Appellant here attempts to liken the circumstances of his interrogation to those in *Dixon,* when, in fact, they are more akin to the cases decided after *Dixon,* particularly *Travaglia.* Appellant, a resident of Harrisburg, Pennsylvania, was found at a roadside stop in Northern Florida in a stolen vehicle from North Carolina one week after a police officer from Harris-

burg was abducted. Clearly, Detective Bruce's interrogation of appellant followed hard upon the criminal episode. Indeed, appellant was still "on the run" from that crime and the severity of his criminal acts had yet to be discovered. Further, the crime for which appellant originally was arrested, car theft, was a crime committed to facilitate his flight from the scene of the crime in Pennsylvania. To conclude that appellant was not aware he would be questioned about his whereabouts and activities in the days prior to his apprehension in Florida is "tantamount to treating as fact that which is patently hypothesis and fantasy." *Travaglia, supra,* at 487, 467 A.2d at 294.

We note that the United States Supreme Court has held that there is no requirement that a suspect have knowledge of the specific crimes about which he or she is to be questioned. In *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), ATF agents arrested a man on charges of selling stolen firearms to undercover agents. At the time they questioned the defendant, the agents had information that he had committed a murder. After questioning him about the guns, they asked him if he had ever shot anyone. He admitted that he had, but denied killing the person agents asked him about. The issue before the United States Supreme Court was whether the statement was admissible in light of the fact that the defendant had not been informed of the nature of the questioning.

The *Spring* Court held that suppression was unwarranted because "a suspect's awareness of all the possible subjects of questioning in advance of questioning is not relevant to determining whether the suspect voluntarily, knowingly and intelligently waived his Fifth Amendment privilege." *Id.* at 577, 107 S.Ct. at 859. The court reasoned that additional information regarding the specific charges could "affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." *Id.* at 577, 107 S.Ct. at 859.

Considering *Dixon* and its progeny, as well as *Spring,* which was decided after *Dixon,* we find no error in the trial

court's denial of the motion to suppress.[7] We hold that appellant's waiver was knowing and intelligent even though he was not specifically informed that he would be questioned about Officer Bowser. The Commonwealth met its burden of showing by a preponderance of the evidence that appellant knew he would be questioned about the circumstances surrounding the crime for which he was arrested, namely, the car theft in North Carolina. The theft was directly related to appellant's flight from Pennsylvania and Officer Bowser's murder.

We likewise reject appellant's second claim, that is, that the trial court erred when it utilized the language of *Spring* in its charge to the jury. Because this claim is premised on appellant's belief that his waiver was not knowing and intelligent, our previous discussion forecloses the issue.

 Appellant next argues that the trial court erred in admitting several Commonwealth exhibits which were so

7. In his brief, appellant argues that even if *Colorado v. Spring* is found to be controlling on a federal constitutional basis, we should nonetheless grant relief based on the greater protections afforded in our state constitution. Appellant's Brief at 19.

Our supreme court recently held that the failure of an appellant to present a state constitution-based claim in the form set forth in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), was not a fatal defect. *See Commonwealth v. Swinehart*, 541 Pa. 500, 664 A.2d 957 (1995). However, an appellant remains responsible for setting forth a reasoned legal argument in support of his or her position. *See Commonwealth v. Martorano*, 535 Pa. 178, 634 A.2d 1063 (1993).

In support of his state constitutional argument, appellant merely states that Article 1 Section 9 of our constitution has "vitality separate and distinct from that of the Fifth Amendment to the U.S. Constitution," and offers two cases as authority for that proposition. Despite the fact that an *Edmunds* analysis is no longer mandatory, we believe a single sentence is insufficient to support a complex legal argument on appeal.

In any event, our supreme court already has engaged in a lengthy *Edmunds* analysis of Article 1 Section 9 and found only a very minor difference between it and its federal corollary. *See Commonwealth v. Hayes*, 544 Pa. 46, 674 A.2d 677, (1996) (state constitution does not expand protections under *Miranda* to include the right to refuse to submit to field sobriety tests). Therefore, under the authority of *Hayes*, we reject appellant's state claim.

harmful and prejudicial that a fair trial was impossible.[8] The standard here is clear. Appellant must establish that the inflammatory effect the evidence had on the minds and passions of the jurors outweighed its evidentiary value. *Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 1270, 134 L.Ed.2d 217 (1996); *Commonwealth v. Groff,* 356 Pa.Super. 477, 514 A.2d 1382 (1986), *appeal denied,* 515 Pa. 619, 531 A.2d 428 (1987).

Upon review of the photographs, we find that appellant simply has not met his burden. *See Commonwealth v. Jacobs,* 536 Pa. 402, 639 A.2d 786 (1994). With respect to the window screen and clock radio from the victim's apartment, we find no merit in appellant's claims. As noted by the trial court, any change in the appearance of these items occurred during the period of time between the first and second trials. The changes themselves were minor; in addition, the changes were explained to the jury. Admission of the evidence was proper.

■ Appellant further argues that he was wrongly precluded from offering evidence of Pflugler's motive to commit the homicide. The evidence at issue is telephone records showing calls made by police investigators to massage parlors and Pflugler's alleged affiliations with massage parlors.

We find no abuse of discretion in the trial court's conclusion that this proffered evidence was either too attenuated to be deemed relevant or was inadmissible hearsay. *See Commonwealth v. Foy,* 531 Pa. 322, 612 A.2d 1349 (1992). Appellant sought to link Pflugler, who he claimed worked in a massage parlor, with the victim, who he claimed visited massage parlors. However, much of appellant's evidence on this point was vague, unsubstantiated and inadmissible for the reasons stated above. Further, despite adverse rulings with respect to some of the evidence he sought to offer, appellant was permitted to offer other evidence in this vein to show that Pflugler knew the victim and that she alone was responsible for Officer

---

**8.** The exhibits included several photographs which appellant claims were overly prejudicial and some items from the victims apartment which were allegedly "altered" prior to the second trial.

Bowser's murder.[9] This defense theory was rejected by the jury.

 Appellant further complains that he was precluded from establishing "the unlikeliness of [appellant] and Pflugler being accomplices or co-conspirators." He refers to the fact that the the text of the criminal complaint against Pflugler failed to name him as a co-conspirator. We find that even if relevant, any error in preventing appellant from bringing this fact to the jury's attention was harmless. *See Commonwealth v. Fewell,* 439 Pa.Super. 541, 654 A.2d 1109 (1995).

 Appellant also challenges the testimony of William O'Dell. Mr. O'Dell, a resident and business owner in North Carolina, testified to the theft of his company van and credit cards. He also identified several forged credit card receipts which linked the thefts to appellant and Pflugler's route to Florida. The court permitted O'Dell to testify but cautioned the jury to use the testimony only to evaluate Pflugler's credibility.

Appellant claims that because the burglary was an uncharged offense, evidence of it was inadmissible. In his brief, appellant concedes that the burglary would be admissible under *Commonwealth v. Gaddis,* 432 Pa.Super. 523, 639 A.2d 462 (1994), to prove appellant's effort to conceal the commission of the homicide and escape its consequences. However, appellant argues, because the evidence was instead utilized to corroborate Pflugler's testimony regarding the break-in, it served only to inflame the passions of the jury.[10] We dis-

**9.** Appellant offered the testimony of a woman who worked at a massage parlor and claimed to have seen Officer Bowser there. Appellant also presented the testimony of a police investigator who interviewed the massage parlor employee when she related her sighting of the victim to police shortly after he was reported missing. Finally, appellant offered the testimony of a friend of Pflugler's who claimed that Pflugler worked in a massage parlor and met the victim there. Pflugler also allegedly admitted to her friend that she and appellant were involved in the kidnapping and murder of Officer Bowser but that she (Pflugler) fired the fatal shot.

**10.** Pflugler, a Commonwealth witness, claimed that appellant arrived at her home in Allentown with the victim already in his trunk. She

agree. O'Dell's testimony was properly admitted and the fact that it would have been admissible under an additional theory strengthens, rather than undermines, the propriety of its admission.

Appellant's last claim is one alleging insufficient evidence. A thorough review of the evidence in the light most favorable to the Commonwealth belies this claim.

Judgment of sentence affirmed. Jurisdiction relinquished.

accompanied him to the deserted area where appellant shot the victim and covered his body. The two of them fled south to Virginia and then to North Carolina where appellant broke into a business and stole a van and some credit cards. Ultimately, they drove to Florida where they were picked up by police.